698 S.E.2d 572

**The STATE, Respondent,**

v.

**Steven V. BIXBY, Appellant.**

**No. 26871.**

Supreme Court of South Carolina.

Heard Nov. 18, 2009.
Decided Aug. 16, 2010.
Rehearing Denied Sept. 23, 2010.

530

Chief Appellate Defender Robert M. Dudek and Appellate Defender LaNelle C. DuRant, both of Columbia; Ernest Charles Grose, Jr., of Greenwood, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor Jerry Peace, of Greenwood, for Respondent.

Chief Justice TOAL.

Steven V. Bixby was charged with the murder of Abbeville County Deputy Sheriff Danny Wilson and Abbeville County Magistrate's Constable Donnie Ouzts. Bixby was tried by a jury on two counts of murder and related charges. The jury found him guilty of all charges and recommended that he be sentenced to death. The trial judge imposed the death penalty. This appeal followed. We affirm.

## FACTS/PROCEDURAL BACKGROUND

In December 2003, while working on a construction project in Abbeville County, officials from the South Carolina Department of Transportation (SCDOT) encountered the Bixby family. In order to expand SC–72, the SCDOT planned to take advantage of a right of way it held across the Bixbys' property. The Bixbys did not believe that the SCDOT held a right of way across their property and, beginning on December 4, 2003, threatened violence to prevent any construction on their land. These threats culminated in the murders of Deputy Wilson and Constable Donnie Ouzts on Monday, December 8, 2003.

The following is a chronological description of the events which resulted in the murders:

### Thursday, December 4, 2003

On the morning of December 4, 2003, SCDOT officials first met the Bixby family after discovering someone had tampered with the surveyor's stakes on the family's property. SCDOT Construction Superintendent Glen McCaffrey approached the Bixby home to discuss the road widening project. McCaffrey

was accompanied by fellow SCDOT employees Dale Williams and Mike Hannah.

Superintendent McCaffrey showed the construction plans to Appellant, his mother, Rita Bixby, and father, Arthur Bixby, and attempted to persuade them that the SCDOT held a right of way across their property. The Bixbys responded with threats of violence and claimed they would fight to the death if anyone tried to do any construction work on the property.[1] Right of Way Agent Williams told them that SCDOT officials would have to get the Sheriff involved, to which the Bixbys responded that they would kill law enforcement officials if anyone "trespassed" on their property.

SCDOT officials McCaffrey, Williams, and Hannah went to the Sheriff's department, reported the encounter, and conveyed that there was a "serious situation" at the Bixby home. Because these men feared the Bixbys' threats, they requested that an officer be assigned to mediate the situation.

### Friday, December 5, 2003

Around noon on Friday, December 5, 2003, Appellant discussed the road construction project with Dr. Mark Horton, a dentist whose office was near the Bixby home. Steven Bixby and Dr. Horton talked about dealings with the SCDOT. Horton told Steven Bixby that he had hired an attorney and that Dr. Horton, his lawyer, and the SCDOT had set a time to discuss the construction's impact on Horton's property. Describing his conversation with Appellant, Horton testified as follows:

> ... first he told me that he was from New Hampshire and he said that, you know, their motto was something like, you know, if I can't—I'd rather be dead if I can't be free, something like that. And at one point he said that, I've got something that's going to blow this whole project out of the water, and I took that to mean that he had some informa-

---

1. With respect to this encounter, McCaffrey testified:

 ... their issue, what they told me, was that nobody was going to come near their property, nobody was going to do any work in that area there. They said that it was their property; they would—they started cursing at that time stating that they would fight till the last breath and there'd be hell to pay if anybody stepped on their property and/or try to do any work, construction work, on their property.

tion or something. But he was becoming somewhat agitated and I kept telling him that, well, I thought it best if he'd get an attorney and look over his situation and see if they could resolve it. So basically I wished him well and told him that you need to get an attorney, that I had to get one, and I hoped that things would get resolved. But you know, he did seem agitated and he said at one point I think that, they'll take my land over my cold, dead body.

At approximately 3:30 p.m., SCDOT Superintendent McCaffrey contacted Rita Bixby, informing her that he had documents concerning the right of way. Also on the phone with McCaffrey were Williams, Hannah, and Joe McCurry, a fellow SCDOT employee. McCaffrey requested that the Bixbys and SCDOT officials meet the following Monday (December 8, 2003) to discuss the right of way. Rita responded by saying, "Anything you got is lies." Although eventually agreeing to the December 8, 2003 meeting, Rita said that if the men wanted to show her the documents they could meet her at the family's home in five minutes. Three of the SCDOT officials left to meet with Rita. Williams, however, refused to go because he feared the situation might become violent.

When the SCDOT officials arrived at the Bixby home, Rita told them that the documents were forgeries and threatened that her family "would fight till the last breath and there would be hell to pay." She demanded that no construction take place. McCaffrey said they would have to come back with a deputy. Rita replied that the Sheriff's department had no authority over them on private property.

### Sunday, December 7, 2003

On the evening of December 7, 2003, Appellant, Steven Bixby went to a social gathering at the home of Alane Taylor, his former girlfriend. Appellant told Alane, "Tomorrow is the day." Alane asked Steven to explain and he said, "We have all the guns loaded in my dad's house and if anybody comes in the yard we will shoot and if the shooting starts I won't come out alive." Steven also said that this had been planned for some time and that his mother Rita planned to take his brother to Steven's apartment while Steven and Arthur stayed at the house. Alane attempted to talk Steven out of his planned violence.

Additionally, while at Alane's house, Appellant told Alane's daughter, Dana Newton, he intended to shoot law enforcement if they came on his parents' property. Newton testified that Appellant said, "I will, I'll blow their mother f* * * * * * heads off if they step one step onto my parent's property. I will."

Alane and Dana called Abbeville Deputy Barry New, a relative, and told him about Steven Bixby's comments. They said they were concerned that harm would come to anyone that went to the Bixby home. Deputy New called his supervisor and left a message conveying the warnings.

### Monday, December 8, 2003

At 8:30 a.m. on Monday, December 8, 2003, Deputy Wilson met with SCDOT officials McCaffrey, Williams, and Hannah to discuss SCDOT's prior confrontation with the Bixbys and plan for that morning's meeting with the family. After discussing the matter, Deputy Wilson headed straight to the Bixby home. SCDOT officials Williams and Hannah left shortly thereafter.

As Williams and Hannah approached the Bixby home in their vehicle, they noticed that Deputy Wilson's car was in the driveway.[2] However, Deputy Wilson was nowhere to be seen. Williams and Hannah drove past the Bixby home for fear that it was not safe. They drove past again and noticed that the blinds were closed but peep holes were cut into them. The third time they drove past the house they saw Appellant standing in the doorway holding a pistol in one hand and a rifle in the other.

At around 9:30 a.m., Appellant placed a phone call to his mother, Rita, who was at Appellant's apartment with his brother. Appellant informed Rita that the shooting had begun. Rita placed phone calls to the Governor's office, the Attorney General's office, and Dr. Craig Gagnon, a family friend and local chiropractor. Dr. Gagnon went to the Bixby residence.

---

**2.** The men could tell the car was running because they could see exhaust in the cold morning air.

Arriving at the Bixby home at approximately 9:40 a.m., Dr. Gagnon saw two law enforcement officers standing in the front yard of the Bixby home. He heard a shot come from the home and saw Constable Ouzts fall to the ground, mortally wounded. As news of the confrontation spread, several officers arrived and were able to retrieve Constable Ouzts's body. Additionally, the South Carolina Law Enforcement Division (SLED) dispatched approximately fifty agents and tactical support.

After determining Rita's whereabouts, David Alford, an investigator with the Abbeville County Sheriff's Department, apprehended her at Appellant's apartment and transported her to a temporary command center near the Bixby home. While at the command center, Rita refused to help Alford and the SLED agents diffuse the situation stating, "Why would I want to help you, I wanted to be inside with them today but they made me stay outside to tell the world why they died." All other attempts to contact Appellant and his father inside the home were unsuccessful.

At approximately 7:30 p.m., SLED sent robots equipped with cameras toward the house where they were able to peer through a window. The cameras captured footage of Deputy Wilson, who was face down on the floor of the Bixbys' living room with his hands cuffed behind him. He was dead. A team of officers entered the home and retrieved Deputy Wilson's body, which was already stiff from rigor mortis.

At approximately 8:55 p.m., SLED sent another robot into the Bixby home. Arthur fired a shot at the robot, and he and Appellant began firing at the officers outside the house. The officers returned fire and shot tear gas into the home.

The gun fight continued until at approximately 9:25 p.m. when Appellant surrendered and notified police that Arthur was wounded. Again, a robot was sent into the house. Video transmitted by the robot confirmed that Arthur had been shot and was sitting on the bathroom floor surrounded by weapons. At approximately 11:00 p.m., Arthur crawled into the living room and surrendered to authorities.

In August 2004, Appellant was indicted by an Abbeville County Grand Jury on one count of conspiracy to commit murder, one count of kidnapping, two counts of murder, one

count of possession of a firearm or knife during the commission of a violent crime, and twelve counts of assault with intent to kill. The State sought the death penalty for the murders of Deputy Wilson and Constable Ouzts.

A jury trial began on February 14, 2007. On February 18, 2007, the jury returned a verdict of guilty as charged on each count. At the end of the penalty phase, the jury recommended that Appellant be sentenced to death. The trial judge sentenced Appellant to death finding the evidence warranted the penalty and the sentence was not imposed as a result of prejudice, passion, or any other arbitrary factor.[3]

## ISSUES

Appellant presents the following issues for review:

### Guilt Phase

I. Did the trial court err when, during jury qualification, it prevented defense counsel from instructing potential jurors as to the definition of murder?

II. Did the trial court err when it refused to allow the defense to present a witness who was prepared to testify concerning his search for rights-of-way to the Bixby property?

III. Did the court of appeals err when it 1) ruled that the South Carolina wiretap statute was constitutional, 2) ruled that SLED complied with the wiretap statute, and 3) declined to convene an evidentiary hearing to determine if SLED complied with the notification requirements of the wiretap statute?

IV. Did the trial court err when it refused to allow Rita to testify as to her experience in New Hampshire concerning property disputes?

V. Did the trial court err when it allowed various witnesses to testify regarding certain out-of-court statements made by Rita?

---

**3.** The trial judge also imposed five consecutive ten year sentences for Appellant's convictions of assault with intent to kill, a five year sentence for conspiracy, to run consecutive to the assault convictions, and seven concurrent ten year sentences for the remaining assault with intent to kill convictions.

 

VI. Did the trial court err when it refused to charge the jury that the State had the burden of disproving each of the elements of self-defense?

*Penalty Phase*

VII. Did the trial court err when, during the penalty phase, it admitted into evidence a videotape of Deputy Wilson's funeral service?

VIII. Did the trial court err when it declined to rule that the court-ordered mental evaluation of Appellant violated the Fifth Amendment to the United States Constitution and Article I, § 12 of the South Carolina Constitution?

### STANDARD OF REVIEW

■ Generally, "[i]n criminal cases, an appellate court reviews errors of law only and is bound by the factual findings of the trial court unless clearly erroneous." *State v. Bryant*, 372 S.C. 305, 312, 642 S.E.2d 582, 586 (2007).

### LAW/ANALYSIS

### I. Jury Qualification

■ Appellant argues that the trial judge abused his discretion when he did not allow defense counsel to probe jurors concerning the definition of "murder" because this ruling prevented him from ascertaining each potential juror's qualification with regard to their views on capital punishment. We disagree.

Jury qualification began on February 5, 2007 and was completed on February 12, 2007. As part of this qualification, each potential juror completed extensive juror questionnaires designed to elicit general, personal information, and probe for bias and predisposition. The questionnaires contained specific questions concerning each potential juror's view on the death penalty.

Counsel received the answers to these questionnaires, was present during the trial court's questioning of the potential jurors, and was permitted to ask questions of each potential juror. During the first portion of defense counsel's question-

ing of the potential jurors, counsel instructed each person on the definition of murder, as opposed to self-defense. Over counsel's objection, the trial judge instructed him to cease instructing each potential juror as to the definition of murder.

With regard to the jury actually impaneled, defense counsel did not move to disqualify any of the named jurors during individual panel qualification and, critically, defense counsel used only seven of the ten available strikes during jury selection.

"The scope of *voir dire* and the manner in which it is conducted are generally left to the sound discretion of the trial court." *State v. Stanko,* 376 S.C. 571, 575, 658 S.E.2d 94, 96 (2008). Furthermore, "[i]t is well established that a trial court has broad discretion in conducting the *voir dire* of the jury and particularly in phrasing the questions to be asked." *United States v. Jones,* 608 F.2d 1004, 1009 (4th Cir.1979). "To constitute reversible error, a limitation on questioning must render the trial fundamentally unfair." *Stanko,* 376 S.C. at 576, 658 S.E.2d at 97.

### Procedurally Barred

Where counsel fails to exhaust all strikes, appellate review of juror qualification issues is barred. *See State v. Tucker,* 324 S.C. 155, 163, 478 S.E.2d 260, 264 (1996) (holding "[f]ailure to exhaust all of a defendant's peremptory strikes will preclude appellate review of juror qualification issues"). Because defense counsel used only seven of the ten available strikes during jury selection, review of this issue is barred.

### Actual Jurors Were Qualified Without Objection

Nonetheless, even if this issue is not procedurally barred because of Appellant's failure to exhaust all of his peremptory strikes, his arguments concerning jury qualification are without merit.

"[A]ny claim that a jury was not impartial must focus on the juror who ultimately sat at the trial." *Tucker,* 324 S.C. at 162–63, 478 S.E.2d at 264, (citing *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)). As mentioned previously, defense counsel did not move to disqualify any of

the jurors actually impaneled. In our view, the qualification of jurors was extensive and defense counsel did not challenge the qualification of the impaneled jurors because he had sufficient information from both their answers to the detailed questionnaires and his questioning to determine that each was qualified. Thus, Appellant's argument is without merit and, in addition, is barred because he failed to raise any issue with respect to the qualification of the impaneled jurors.

With respect to Appellant's arguments concerning voir dire, the dissent reasons that the trial judge committed reversible error because counsel was not given sufficient latitude to instruct the potential jurors as to the legal definition of murder. We are not persuaded by this position because such information is disseminated to jurors by way of jury instructions, not questioning on voir dire.[4] For these reasons, we find that the trial judge did not commit reversible error when he refused to allow defense counsel to probe jurors concerning the definition of murder.

## II. Title Abstract Witness

Appellant argues the trial court committed reversible error when it refused to allow a defense witness to testify about his search for records concerning the right of way at issue. We disagree.

Appellant attempted to present the testimony of Patrick White (White), who was retained by Appellant to conduct a title abstract on the Bixby property. Appellant wanted to establish, through White's testimony, that he had a good faith belief that there was no right of way on the Bixby property. Further, Appellant wanted to rebut the State's argument that the records concerning the right of way were easily accessible to the public. The State objected to the witness's testimony as irrelevant.

During an *in camera* hearing, title abstractor White's testimony was proffered to the trial judge. White said that he found no record of any easements, encroachments, or rights-

---

4. Even if we agreed with its position on this issue, curiously, the dissent would remand the matter for a new sentencing phase only. When an error occurs in juror selection, ordinarily it requires a reversal of the guilt as well as the penalty phase.

of-way pertaining to the Bixby property filed at the Abbeville County Clerk of Court's office. The trial judge asked White if he was familiar with S.C.Code Ann. § 57–5–570 (1993), which requires that copies of highway plans with right of way designation be maintained in the tax assessor's office for each county. White replied that he was not familiar with this statutory provision and that he did not search the tax assessor's office for a record of the right of way. The trial judge ruled that White's testimony was irrelevant and inadmissible because White was unaware of section 57–5–570 and did not conduct a complete search for the public record of the rights-of-way on the Bixby property.[5]

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. White's testimony was not relevant to the defense's position because he only looked for records of the right of way at the Abbeville County Clerk of Court's office. Because White did not search for a record of the right of way in the county tax assessor's office where S.C.Code § 57–5–570 requires that they be maintained, his testimony did not have the tendency to make it more or less probable that 1) Appellant had a good faith belief that there was no right of way on his family's land, and 2) the records concerning the right of way were not easily accessible to the public.

In any event, even if White's testimony were relevant, its exclusion by the trial court was appropriate pursuant to Rule 403, SCRE, because it would have misled the jury.[6] White's testimony that he did not find any record of the right of way at the court house would only lead the jury to believe that a right of way should have been recorded at the clerk of court's office, which is contrary to state law.

---

5. Specifically, the trial judge, said, "the witness didn't go to the maintenance shed so he doesn't know if its public knowledge or it's available."

6. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE.

### III. Court of Appeals' Order

At trial, SLED Chief Robert Stewart (Chief Stewart) testified that during the standoff he "called Chief Justice Jean Toal and Circuit Court Judge Johnson to get the necessary authority to begin intercepting any calls that were coming into or out of the [Bixby] house to try to determine what was going on in the house." Judge Johnson made the following notation on his calendar for December 8, 2003:

Talked to Chief Stewart, 2:48. [Illegible] 2 different. Mother and brother somewhere else. Steven Vernon Bixby w/father. & mother & brother somewhere. Authorized 2 wiretaps.

SLED initiated the wiretap at 4:54 p.m. At approximately 8:55 p.m. the line became open and recorded heavy gun fire and Appellant's eventual surrender. Consistent with S.C.Code Ann. § 17–30–95 (2002), on December 10, 2003, Judge Johnson entered an order authorizing the emergency interception of wire and electronic communications.

Appellant filed a motion in the trial court to suppress the evidence obtained from the wiretap. This motion was denied. Appellant then petitioned the court of appeals for a motion to suppress the evidence and requested an evidentiary hearing on the matter. The court of appeals declined to conduct an evidentiary hearing and denied Appellant's motion to suppress. At trial, the tape recording of gun fire and Appellant's surrender obtained by the wiretap was played for the jury.

Appellant argues the court of appeals erred when it 1) ruled that the South Carolina wiretap statute does not violate the Fourth Amendment to the United States Constitution or the right to privacy in the South Carolina Constitution, 2) ruled that SLED complied with the notification requirements in the South Carolina wiretap statute, and 3) denied Appellant's request for an evidentiary hearing on his motion to suppress the evidence gathered in the wiretap. As to all of these arguments, we disagree.

#### Constitutionality of Wiretap Statute

Appellant argues that the court of appeals erred when it determined the emergency provisions of the South Carolina wiretap statute, S.C.Code Ann. § 17–30–95 (2002), do not

violate the Fourth Amendment to the United States Constitution and Article I, Section 10 of the South Carolina Constitution. Appellant argues that the emergency provisions are unconstitutional because they allow a judge to approve a wiretap without a probable cause determination. Section 17–30–95 states:

(A) Notwithstanding any other provision of this chapter, any agent of the South Carolina Law Enforcement Division specifically designated by the Attorney General or his designated Assistant Attorney General may intercept the wire, oral, or electronic communication if an application for an order approving the interception is made within forty-eight hours after the interception begins to occur, and the agent determines that more likely than not:

(1) an emergency exists that involves an offense provided for in Section 17–30–70 [7] and an immediate danger of death or serious physical injury to any person or the danger of escape of a prisoner and requires that a wire, oral, or electronic communication be intercepted before an order authorizing the interception can, with due diligence, be obtained; and

(2) there are grounds upon which an order could be entered under this chapter to authorize the interception.

(B) In the absence of an order, the interception must immediately terminate when the communication sought is obtained or when the application for the order is denied, whichever is earlier. If the application for approval is denied, or in any other case in which the interception is terminated without an order having been issued, the contents of any wire, oral, or electronic communication intercepted must be treated as having been obtained in violation of Section 17–30–20, and an inventory must be served as provided for in Section 17–30–100(E) on the person named in the application.

(C) Agents of the South Carolina Law Enforcement Division designated to intercept wire, oral, or electronic commu-

---

**7.** Relevant offenses included in S.C.Code Ann. § 17–30–70(1) (2002) are murder, assault and battery with intent to kill, kidnapping, and voluntary manslaughter.

nications pursuant to this section must have completed training provided by SLED pursuant to Section 17–30–145. (D) A judge of competent jurisdiction must be notified orally of the intent to begin the interception of any wire, oral, or electronic communication when an emergency exists pursuant to the provisions of this section before any interception is conducted. The judge must make a written record of this notification.

Appellant does not argue that the emergency circumstances contemplated by the statute did not exist. He argues that section 17–30–95(D) is unconstitutional because it allows a wiretap to begin upon oral notification of a "judge of competent jurisdiction." [8]

Appellant's argument has no merit because the commencement of a wiretap after oral notification of a judge of competent jurisdiction is akin to a warrantless search conducted when exigent circumstances demand immediate action, a practice the United States Supreme Court and this Court have established is constitutional. *See Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (recognizing that "warrantless entry by criminal law enforcement official may be legal when there is compelling need for official action and no time to secure a warrant"); *State v. Brown,* 289 S.C. 581, 586, 347 S.E.2d 882, 884 (1986) (opining that "[t]he exigent circumstances doctrine is an exception to the Fourth Amendment's protection against searches conducted without prior approval by a judge or magistrate"). Because the commencement of a wiretap upon oral notification of a judge is only allowed in the emergency circumstances specifically outlined in the statute, the wiretap statute is constitutional under the exigent circumstances doctrine.

### SLED Compliance with Notification Procedures

■ Alternatively, Appellant argues that the court of appeals erred in ruling that SLED complied with the notification requirements of S.C.Code Ann. § 17–30–95 (2002). Specifically, Appellant argues that SLED did not follow the procedures

---

8. A "judge of competent jurisdiction" is "a circuit court judge designated by the Chief Justice of the Supreme Court of the State of South Carolina." S.C.Code Ann. § 17–30–15(8) (2002).

of the wiretap statute because there is no evidence in the record that Chief Justice Toal designated Judge Johnson as a "judge of competent jurisdiction" to authorize an emergency wiretap. Appellant's argument is without merit.

Section 17–30–95(D) states, "[a] judge of competent jurisdiction must be notified orally of the intent to begin the interception of any wire, oral, or electronic communication when an emergency exists pursuant to the provisions of this section before any interception is conducted." A "judge of competent jurisdiction" is defined as a circuit court judge designated by the Chief Justice. *See* S.C.Code Ann. § 17–30–15(8) (2002). At the time he was notified of SLED's intent to commence a wiretap at the Bixbys' property, Judge Johnson was assigned, by order of the Chief Justice, to be Chief Administrative Judge of the Eight Judicial Circuit.[9] S.C.Code Ann. § 14–5–350 provides:

> ... judges shall have at chambers in any county within the circuit in which ... they are assigned to hold court all powers and jurisdiction which they have and exercise in open court in any county within such circuit. ...

Abbeville County, where the wiretap occurred, is in the Eighth Judicial Circuit. Therefore, Judge Johnson was designated by Chief Justice Toal as a judge of competent jurisdiction for the purposes of notification under section 17–30–95(D).

Additionally, Appellant argues that SLED did not follow the procedures of the wiretap statute because it could have received written authorization from Judge Johnson who was holding court nearby in Greenwood. Simply put, written authorization is not required by the statute when emergency circumstances exist. The record makes clear that the situation was an emergency as contemplated by the statute; therefore, this argument is without merit.

### Denial of Evidentiary Hearing

Appellant argues that the court of appeals erred when it declined to conduct an evidentiary hearing concerning the validity of the wiretap. When it issued its order in this matter, the court of appeals was serving as a "reviewing authority" pursuant to S.C.Code Ann. § 17–30–110(A) (2002),

---

**9.** Administrative Order of the Chief Justice, September 23, 2002.

which provides that a "reviewing authority may, in its discretion, conduct a hearing and require additional testimony or documentary evidence." Appellant claims that there are certain factual issues that the pleadings failed to resolve. Specifically, Appellant argues the court of appeals should have conducted fact finding with respect to the designation of Judge Johnson to receive oral notification under section 17–30–95(D) and whether SLED could have received written authorization to conduct the wiretap at issue.

Appellant's argument in this respect is without merit. First, as is made clear above, Judge Johnson was the Chief Administrative Judge for the Eighth Judicial Circuit. Therefore, it cannot be said that the court of appeals abused its discretion by declining to conduct an evidentiary hearing with respect to this issue. Second, it is clear from the record that the situation at the Bixby residence was an emergency as contemplated by the statute. Appellant argues that SLED had enough personnel in the area to drive to Greenwood where Judge Johnson was holding court and receive written authorization to conduct a wiretap. The statute simply did not require written authorization in this situation. Therefore, Appellant's argument is entirely without merit.

## IV. Rita Bixby's Experience in New Hampshire

Appellant argues the trial court committed reversible error when it refused to allow Rita to testify concerning her experience handling property disputes in New Hampshire. We disagree.

As part of its case-in-chief in the guilt phase, the State presented evidence that the Bixby family never hired an attorney to act as their agent in the dispute with SCDOT. At trial, Rita testified that she had enough experience to deal with the legal aspects of the situation on her own, thus she did not need an attorney. Defense counsel then asked Rita to explain her prior "experience" handling property disputes. The State objected to this question as irrelevant and the trial court sustained the objection.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence." Rule 401, SCRE. We find that evidence concerning the details of Rita's handling of property disputes in New Hampshire is irrelevant to why her family did not hire an attorney to act as their agent in the dispute with the SCDOT. When the State made an issue out of the fact that the Bixbys could have hired an attorney but did not, it was certainly relevant for counsel to ask Rita if she thought she was capable of handling the dispute and, if so, why. This question was posed to Rita and she answered it.

Nonetheless, Appellant argues that Rita should have been able to testify concerning the details of the matters in which she was involved in New Hampshire. The record demonstrates that Rita simply wanted to testify as to her views of government and the Constitution, a matter that is not relevant to the question of why she did not hire an attorney.

## V. Admission of Rita Bixby's Out–of–Court Statements

Appellant argues that the trial court erred when it allowed Deputy Alford; Appellant's former girlfriend, Alane Taylor; and Sheriff Goodwin to testify about certain out-of-court statements made by Rita. We disagree.

Rule 613(b), SCRE, states:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is advised of the substance of the statement, the time and place it was allegedly made, and the person to whom it was made, and is given the opportunity to explain or deny the statement.

Appellant argues that the State failed to lay a proper foundation pursuant to Rule 613(b), SCRE, for the testimony of Deputy Alford, Ms. Taylor, and Sheriff Goodwin. Appellant's argument is without merit.

### *Alford*

Deputy Alford was one of the law enforcement officers who apprehended Rita at Appellant's apartment and spoke with her at the temporary command center. At trial, the State questioned Rita with respect to her interaction with Deputy Alford. Rita denied speaking to Deputy Alford on the morning of the murders. Additionally, she denied knowing who Deputy Alford was and denied telling anyone that she

was not in the house at the time of the murders because she needed "to tell the world" why Appellant and Arthur were killed.

The State called Deputy Alford to testify concerning his interaction with Rita on the morning of the murders. Alford testified:

And during the course of the conversation back and forth with Mrs. Bixby one of the officers—I believe it was one of the SLED agents—asked her, said, ma'am, would you please just pick up the phone, call the house, and try to help us out. Tell them to come out, enough hurt's been done, just put the guns down and come out. And her exact statement was, and I quote, why would I want to help you, I wanted to be inside with them today but they made me stay outside to tell the world why they died, unquote.

Appellant's argument is without merit because the State laid a proper foundation for Deputy Alford's testimony under Rule 613(b). The series of questions asked of Rita concerned the substance of the statement, the time and place it was made, and the person to whom it was made. Once Rita denied making the statement, the State had laid a foundation to ask Alford about the statement.

### Taylor

Alane Taylor was Appellant's former girlfriend. The record indicates that Alane spoke with Rita on the telephone the morning of the murders at issue.

On cross-examination, the State asked Rita if she recalled receiving a phone call from Alane. Rita admitted that she received this phone call. The State specifically asked if she recalled making the following statements to Alane during that phone call:

1) Appellant told her to take his brother and leave the home,

2) Appellant had shot a deputy,

3) She was proud of Appellant for standing up for her rights,

4) She wanted to be present for the shooting, and

5) She would have shot someone if she had been at her home.

Rita denied making each of these statements.

The State called Alane as an impeachment witness. The trial judge found the State laid a proper foundation under Rule 613(b), SCRE. Taylor testified that she tape recorded the phone conversation with Rita. After the tape was played for the jury, Alane testified that it was genuine and Rita actually said all of the aforementioned things to her.

The record clearly reflects that Rita admitted having the conversation at issue but specifically denied making the statements later testified to by Taylor. Thus, the State laid a proper foundation under Rule 613(b), SCRE, and we find that Appellant's argument is entirely without merit.

### Sheriff Goodwin

The record indicates that Rita spoke to Sheriff Goodwin from Dr. Gagnon's phone on the morning of the incident. The State questioned Rita concerning this conversation. Rita admitted speaking with Sheriff Goodwin from Dr. Gagnon's phone. However, she denied that the Sheriff begged her "to call Arthur and Steven and ask them to come out." Rita claimed that the phone conversation was "cut off" due to a "dead spot" and denied hanging up on the Sheriff.

Over Appellant's objection, Sheriff Goodwin testified concerning the telephone conversation with Rita on December 8, 2003. He said:

After arriving at the scene on—at 4—at the Bixby resident [sic] and after talking to some bystanders there, Doctor Craig Gagnon, I made a call to the resident [sic] of the Bixby with no answer. Mr. Gagnon, Doctor Gagnon said to me I can get her on the telephone. I talked to Mrs. Rita Bixby. And after talking to Mrs. Rita Bixby I asked her and pleaded with her would she please call the resident [sic] where [Appellant] and Arthur Bixby was and asked her would she ask [Appellant] and Arthur to come out and let's talk about what was going on out there on this particular day. And after talking to Mrs. Bixby for a while, she got calling me—that she had called the Attorney General's Office, she had called the other office. But I stated to Mrs.

Bixby, I said, Mrs. Bixby, but you never called the Abbeville County Sheriff office, would you please call [Appellant] and Arthur and ask them to come out and let's talk about what's going on at the resident [sic] at the time ... She hung up the telephone on me.

Appellant does not contest that Rita was apprised of the time and place of the statement or to whom it was made. Nonetheless, Appellant argues that Rita was not apprised of the substance of the statement she made to Sheriff Goodwin and thus a proper foundation was not laid under Rule 613(b), SCRE.

Rita was specifically asked, "[d]id Sheriff Goodwin not beg you to call Arthur and Steven and ask them to come out?" Rita denied that she was ever asked this question by Sheriff Goodwin. Additionally, Rita was asked "[d]idn't you really hang up on him?" Rita denied that she hung up on Sheriff Goodwin. Sheriff Goodwin's testimony concerning Rita's statements to him was limited to the fact that he asked her to call Steven and Arthur and that Rita hung up on him. Therefore, the record clearly indicates that Rita was apprised of the substance of the statement at issue and therefore Appellant's argument is without merit.

## VI. Jury Charge on Self–Defense

Appellant argues that the trial court erred when it declined to charge the jury that the State had the burden of disproving each element of self-defense. We disagree.

Once raised by the defense, the State must disprove self-defense beyond a reasonable doubt. *State v. Burkhart,* 350 S.C. 252, 260, 565 S.E.2d 298, 302 (2002). There are four elements required by law to establish a case of self-defense. *State v. Davis,* 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984). The four elements are:

First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the

same belief. If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life. Fourth, the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance. If, however, the defendant was on his own premises he had no duty to retreat before acting in self-defense.

*Id.* "When self-defense is properly submitted to the jury, the defendant is entitled to a charge, if requested, that the State has the burden of disproving self-defense by proof beyond a reasonable doubt." *Burkhart,* 350 S.C. at 261, 565 S.E.2d at 303. The trial judge charged the jury on self-defense as follows:

Now the issue of self-defense has been raised in this case. Self-defense is a complete defense, and if it is established you must find the defendant not guilty of murder. The State has the burden of proof in this case, and this includes proving the absence of the elements of self-defense beyond a reasonable doubt.

Because all the elements are required to establish self-defense, we are not persuaded by Appellant's argument. It is an axiomatic principle of law that the defense has not been established if any one element is disproven. A jury charge on this issue should state 1) the State has the burden of disproving self-defense and 2) this burden is carried by disproving any one of the four elements by proof beyond a reasonable doubt. We find that the charge issued by the trial judge complied with these requirements.

### VII. Funeral Videotape

Appellant argues the trial court erred when, during the sentencing phase of his trial, it admitted a seven minute video showing portions of Deputy Wilson's funeral. We disagree.

The video at issue here contained footage that showed the folding of an American flag over the closed coffin; the playing of "Taps" on a trumpet; footage of mourners; and a recording

of a fictional 911 call in which Deputy Wilson is given permission to "return home," a tradition at law enforcement funerals. Over Appellant's objection, the trial judge concluded that the video was admissible because it went to the question of the victim's uniqueness, showed the harm committed by Appellant, and showed the impact of the victim's death on his family and the community.

 "A trial judge has considerable latitude in ruling on the admissibility of evidence and his ruling will not be disturbed absent a showing of probable prejudice." *State v. Ard,* 332 S.C. 370, 378, 505 S.E.2d 328, 332 (1998). Nonetheless, S.C.Code Ann. § 16–3–25(C)(1) establishes that a death sentence must be vacated if it was "imposed under the influence of passion, prejudice, or any other arbitrary factor."

Appellant argues that the admission of the video introduced an arbitrary factor into the sentencing phase of his trial in violation of S.C.Code Ann. § 16–3–25(C)(1) and the Eight Amendment. *See State v. Northcutt,* 372 S.C. 207, 641 S.E.2d 873 (2007) (finding that the prosecution's improper closing argument that utilized a dramatic, mock funeral warranted a new trial). In reply, the State relies on *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and argues that the video was admissible as "victim impact" evidence and did not unduly prejudice Appellant.

Turning to Appellant's argument, in *Northcutt,* this Court vacated Northcutt's death sentence holding that a staged funeral procession in which the solicitor draped a large, black shroud over a baby crib and dramatically wheeled it out of the courtroom introduced an arbitrary factor into the sentencing phase of the defendant's trial. The instant matter is distinguishable from *Northcutt* for one major reason: the video showed events that actually took place, whereas the *Northcutt* funeral was a staged dramatization.[10] A staged funeral procession in which a solicitor dramatically and in person drapes a shroud over a baby's crib has more of a tendency to elicit

---

**10.** Appellant correctly asserts that the 911 call played at Deputy Wilson's funeral was a dramatization. However, unlike the solicitor's dramatization at issue in *Northcutt,* the dramatized 911 call was part of Deputy Wilson's funeral service and is relevant to victim impact.

passion and prejudice than a videotape showing excerpts from a victim's actual funeral.

Turning to the State's argument, a State may conclude that victim impact evidence "is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Payne*, 501 U.S. at 827, 111 S.Ct. 2597. Victim impact evidence demonstrates "the loss to the victim's family and to society which has resulted from the [victim]'s homicide." *Id.* at 822, 111 S.Ct. 2597. We find the videotape at issue was victim impact evidence because it showed the traditional trappings of a law enforcement officer's funeral, demonstrating the general loss suffered by society. Additionally, the video showed footage of actual mourners, displaying for the jury the specific impact of the murder on particular members of society. Thus, we hold the video was victim impact evidence pursuant to *Payne*.

Nonetheless, this evidence is subject to Rule 403, SCRE, which states that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We find the probative value of the videotape was not substantially outweighed by the danger of unfair prejudice. As the trial judge ruled, the videotape was relevant to show the uniqueness of the victim, the harm committed by Appellant, and the impact of the victim's death on his family and society.

Additionally, deference is due to the trial court's admission of the evidence. After all, "[a] trial judge has considerable latitude in ruling on the admissibility of evidence and his ruling will not be disturbed absent a showing of probable prejudice." *Ard*, 332 S.C. at 378, 505 S.E.2d at 332. In our view, it is not probable that Appellant was prejudiced by the State's presentation of the videotape at issue to the jury.

The dissent would reverse Appellant's capital sentence because the video was moving and could have caused the jurors to feel sympathy for the mourners and "outrage at the person who inflicted the suffering." Under the law, simply saying that evidence such as this was "moving" is not enough to

require reversal of a capital sentence. Addressing this issue before, we have said:

> The appellant has the burden of showing that any alleged error deprived him of a fair trial. The relevant question is whether the solicitor's action so infected the trial with unfairness as to make the resulting conviction a denial of due process. The Court must review the argument in the context of the entire record.

*State v. Finklea,* 388 S.C. 379, 697 S.E.2d 543 (2010) (citing *State v. Northcutt,* 372 S.C. 207, 222, 641 S.E.2d 873, 881 (2007)). In our view, there is no evidence in the record sufficient to establish a finding of prejudice. Thus, we are not persuaded by the dissent's reasoning and affirm the decision of the trial court.

## VIII. Mental Evaluation

Appellant argues that the trial court's order compelling him to submit to a mental evaluation violated his Fifth Amendment right against self-incrimination. We disagree.

Prior to the sentencing phase of the trial, defense counsel indicated that Appellant intended to present mitigation evidence concerning his mental health. Upon the State's motion, the trial court ordered Appellant to submit to a mental health examination pursuant to *State v. Locklair,* 341 S.C. 352, 535 S.E.2d 420 (2000). In order to protect Appellant, the trial court ordered that 1) the report would be sealed from the State until evidence concerning Appellant's mental state was presented by him in the sentencing phase, 2) defense counsel was allowed to be present during the evaluation and he could object to any question posed to Appellant by the examiner, and 3) any inculpatory statements made by Appellant during the evaluation would not be revealed in the report.

### *Self–Incrimination*

A criminal defendant has a right against self-incrimination. U.S. Const. amend. V; S.C. Const. art. I, § 12. Additionally, a capital defendant has a federal constitutional right to present any relevant mitigation evidence. *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Accordingly, S.C.Code Ann. § 16-3-20(C)(b) (2007) provides that evidence which tends to establish or rebut any

mitigating factors [11] may be offered during the sentencing phase of a capital proceeding.

This court has established that when a defendant indicates that he intends to offer evidence concerning his mental health during the guilt phase of his trial, he has opened the door to the issue. *See Locklair*, 341 S.C. at 365, 535 S.E.2d at 427. Further, where a trial court is under the impression that a criminal defendant's mental condition will be an issue at trial, it has the inherent authority to order an independent mental evaluation of that defendant. *Id.* at 364, 535 S.E.2d at 427. Under such circumstances, ordering a criminal defendant to submit to a mental evaluation does not violate his right against self-incrimination. *Id.*

Appellant argues that *Locklair* does not apply to the instant matter because the facts of that case concerned mental health relative to competency to stand trial, not the statutory mitigating factors at issue in a sentencing phase. Appellant is correct. Nonetheless, we must address whether a court can order a criminal defendant to submit to a mental health evaluation where that defendant indicates his intent to introduce evidence concerning his mental health during the sentencing phase of his trial. This is a novel issue in South Carolina. We answer the question in the affirmative. We find persuasive the reasoning of the Pennsylvania Supreme Court in *Commonwealth v. Sartin*, 561 Pa. 522, 751 A.2d 1140 (2000).

In *Sartin*, the Pennsylvania Supreme Court upheld a trial court's order compelling a criminal defendant to submit to a mental health evaluation after he indicated an intent to present evidence concerning his mental health in his mitigation

---

11. In the instant case, the trial judge ordered the jury to consider, among others, the following statutory mitigating factors:

1. The murder was committed while the defendant was under the influence of mental or emotional disturbance.

2. The defendant acted under the duress or domination of another person.

3. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

4. The defendant's adaptability to prison life.

These factors come directly from S.C.Code Ann. § 16–3–20(C)(b) (2007).

case during the sentencing phase of his trial. *Sartin,* 561 Pa. at 529, 751 A.2d at 1144. The Court recognized that a court ordered mental evaluation in such circumstances could potentially tread upon a defendant's Fifth Amendment right. *Id.* Thus, the Court held that certain procedural safeguards should be utilized to protect the defendant and ordered that the results of the ordered evaluation be placed under seal until the commencement of the penalty phase. *Id.* at 525, 751 A.2d at 1141.

Turning to the facts of this case, we find that the trial court's order compelling Appellant to submit to a mental evaluation did not violate his Fifth Amendment right against self-incrimination because 1) he indicated an intent to present mental health evidence during the sentencing phase and 2) the trial court utilized procedural safeguards to protect against any self-incrimination.

### *Transactional Immunity*

■■ Appellant argues that he is entitled to transactional immunity because the trial court ordered him to participate in a mental health evaluation and compelled him to answer questions about the facts of his case. We disagree.

■■ The term "transactional immunity" describes an agreement by the government not to prosecute an individual for particular crimes in exchange for self-incriminating testimony or information. *See Piccirillo v. New York,* 400 U.S. 548, 91 S.Ct. 520, 27 L.Ed.2d 596 (1971). Appellant's argument relies solely on his reading of *State v. Thrift,* 312 S.C. 282, 440 S.E.2d 341 (1994) (holding that the South Carolina Constitution requires that a person compelled to provide the government with self-incriminating testimony be granted immunity from any prosecution for a transaction or offense to which the person's testimony relates). In *Thrift,* this Court opined:

> If the government desires to obtain a statement from a citizen which might incriminate him, the government has two options. First, it may obtain from the citizen a voluntary waiver of his right of silence.... The second option the government has if it desires to require a citizen to testify

against himself is to grant the citizen immunity from prosecution.

312 S.C. at 297, 440 S.E.2d at 349.

This matter is clearly distinguishable from *Thrift*. In *Thrift*, the defendants were actually compelled to testify against themselves before a state grand jury. Here, however, Appellant was not compelled to offer self-incriminating testimony during his mental evaluation, thus transactional immunity cannot exist. Appellant's attorney was present at his mental evaluation and was able to object to any questions. Furthermore, by order of the court, any inculpatory statements which may have been in the report were redacted. Because Appellant was not compelled to testify against himself, the court-ordered mental evaluation did not confer transactional immunity upon him.

## PROPORTIONALITY REVIEW

Pursuant to S.C.Code Ann. § 16–3–25(C) (2003), we have conducted a proportionality review. We find the death sentence was not the result of passion, prejudice, or any other arbitrary factor. Furthermore, a review of other decisions demonstrates that Appellant's sentence is neither excessive nor disproportionate. *See, e.g., State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996).

## CONCLUSION

For the aforementioned reasons, we affirm Appellant's death sentence.

BEATTY and KITTREDGE, JJ., concur.

PLEICONES, J., dissenting in a separate opinion in which WALLER, J., concurs.

Justice PLEICONES.

I respectfully dissent and would reverse appellant's capital sentences. I find reversible error in the trial judge's limitation of voir dire and in his decision to admit the funeral video. I would therefore reverse and remand for a new sentencing proceeding.

## I. *Voir Dire*

Appellant contends the trial judge committed reversible error when, mid-voir dire, he refused to allow counsel to continue to explore the potential jurors' understanding of the definition of murder. The majority first holds this issue is not preserved because appellant did not exhaust his peremptory challenges. I disagree with this preservation ruling: appellant's contention is that the trial court's limitation of voir dire denied him the information necessary to decide whether to challenge a juror for cause, or whether to exercise a peremptory challenge should it be necessary. *See State v. Woods,* 345 S.C. 583, 550 S.E.2d 282 (2001) (purpose of voir dire is not only to determine whether a juror is subject to a challenge for cause, but also to allow the parties to elicit information which will allow them to intelligently exercise their peremptory strikes). Appellant's failure to exhaust his strikes cannot be a procedural bar where his contention is that the trial judge's ruling deprived him of the very information he needed to intelligently exercise these strikes.

The issue was preserved when appellant objected to the curtailment of voir dire, and the number of peremptory challenges used is irrelevant. The majority also appears to hold that all jurors seated were qualified based upon their answers to the pretrial questionnaire and because the questioning permitted by the trial judge was sufficient. I disagree.

While the scope of voir dire is generally left to the trial judge's discretion, it is reversible error to limit questions in a manner that renders the trial fundamentally unfair. *State v. Stanko,* 376 S.C. 571, 658 S.E.2d 94 (2008) citing *Mu'Min v. Virginia,* 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). A prospective juror in a capital case must be excused for cause when his beliefs or attitudes against capital punishment would render him unable to return a verdict according to law, S.C.Code Ann. § 16–3–20(E) (2003), or when his views on capital punishment would prevent or substantially impair his ability to act in accordance with his oath and the judge's instructions. *State v. Evins,* 373 S.C. 404, 645 S.E.2d 904 (2007) (internal citations omitted).

As we have acknowledged, a juror may affirmatively answer the inquiry "whether she would consider all the evidence

before deciding the appropriate sentence," but upon further inquiry reveal that the only evidence that would cause her to return a life sentence would be that the killing was done unintentionally or in self-defense. *State v. Evins, supra.* The early voir dire in this case, where the judge permitted the potential jurors to be questioned about their understanding of the definition of murder, led to a number of jurors being dismissed for cause despite their initial indication that they could return either a life or a death sentence.[12] There can be no question but that this jury pool contained a number of individuals who equated all killings with murder, but who upon learning that murder was not an accident, a killing in self-defense, or a "passion killing," were not willing to entertain the possibility of a life sentence. Once the trial judge refused to allow appellant to define murder for these venirepersons, and declined appellant's request that the trial judge himself define that term, appellant was left without the means to make informed decisions about challenges for cause or the exercise of his peremptory challenges.

In *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that a capital defendant was constitutionally entitled to challenge for cause any juror who would automatically vote for death. The Court held:

> We deal here with petitioner's ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt. Were *voir dire* not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so.

---

12. E.g., Mr. Ellifrits affirmed to the trial judge that he could return either a life or a death sentence. On appellant's voir dire, after having murder defined, he stated that all cold blooded murderers, i.e. those who did not kill in self-defense or by accident, deserved death. Mr. Rollings also affirmed to the trial judge that he could return either sentence. On voir dire, however, after having murder defined and distinguished from other types of killings, he testified that all murderers deserve a death sentence.

The Court recognized that voir dire was the only method by which these jurors could be detected, explicitly rejecting the state's contention that "general fairness" and "follow the law" questions were sufficient:

As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed. More importantly, however, the belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law. See *Turner v. Murray*, 476 U.S. [28] at 34–35, 106 S.Ct. [1683] at 1687–1688 [90 L.Ed.2d 27 (1986)] (plurality opinion). It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized." *Id.*, at 36, 106 S.Ct. [at] 1688 (footnote omitted). Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty.

In my opinion, the trial judge's mid-voir dire ruling, denying appellant the opportunity to discern which jurors would in fact be able to follow their oath and instructions, denied appellant his right to a fair sentencing proceeding, and requires that we reverse his capital sentences. It is not reasonable to expect that laypersons in the venire enter the courtroom with an understanding the legal definition of "murder."

## II. *Funeral Videotape*

The majority affirms because it finds the video tape of Deputy William's funeral was properly admitted as victim

impact evidence under *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and because it finds the dramatization of the 911 call admitted as evidence less inflammatory than a staged funeral procession conducted during the State's closing argument. *Compare State v. Northcutt*, 372 S.C. 207, 641 S.E.2d 873 (2007). I would reverse.

In my opinion, the video did not demonstrate anything about the victim's uniqueness, or the impact of his loss on his family or friends or on community groups with which he had been involved. Instead, the video contains a staged 911 call which, we are informed, is standard at law enforcement funerals and thus not related to Deputy Wilson as an individual. Moreover, video of unidentified mourners does not demonstrate the impact of Deputy Wilson's death on his family or friends,[13] but rather reflects the affect of unidentified persons attending the funeral. *Payne* evidence is intended to show the lasting consequences of victim's death, while a funeral video merely preserves the visible expressions of grief exhibited by persons attending the service.

Under *Payne*, the jury is constitutionally permitted to consider "the specific harm caused by the crime in question" through the introduction of "evidence about the victim and about the impact of the murder on the victim's family." In my view, *Payne* evidence must be presented through testimony of those who have suffered as a result of the victim's death. Cf. *Humphries v. State*, 351 S.C. 362, 570 S.E.2d 160 (2002) (*Payne* permits victim impact evidence in the form of testimony). I find the video tape, including the staged 911 call, did not constitute *Payne* evidence.

Unlike the majority, I find appellant suffered prejudice as the result of this improper evidence. I venture to say there are few individuals who could view this video without themselves being moved both by sympathy for the mourners and by outrage at the person who inflicted this suffering. Even if

---

13. The majority holds the video demonstrated the impact of Deputy Wilson's death on the community. In my opinion, this is a misapprehension of victim impact evidence. It is permissible to present evidence, through the testimony of the deceased's friends or family, of the impact of the decedent's loss, including the loss to the community. There is no general "community impact loss" component of victim impact evidence under *Payne*.

appellant did not suffer prejudice, I would hold the admission of this video violated the statutory prohibition of a death sentence "imposed under the influence of passion, prejudice, or any other arbitrary factor," S.C.Code Ann. § 16–3–25(C)(1) (2003), and thus requires that we reverse the sentencing proceeding.

## CONCLUSION

I would reverse appellant's capital sentences and remand for a new sentencing proceeding, at which the funeral video would not be admissible.

WALLER, J., concurs.