SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, ) | Arizona Supreme Court |
| ) | No. CR-10-0362-AP |
| Appellee, ) | |
| ) | Maricopa County |
| v. ) | Superior Court |
| ) | No. CR2007-149013 |
| EDWARD JAMES ROSE, ) | |
| ) | |
| Appellant. ) | |
| ) | **O P I N I O N** |
| _____ ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Paul J. McMurdie, Judge

**AFFIRMED**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
      By    Kent E. Cattani, Chief Counsel
            Criminal Appeals/Capital Litigation
            Jeffrey A. Zick, Section Chief Counsel          Phoenix
            Criminal Appeals/Capital Litigation
            Laura Chiasson, Assistant Attorney General      Tucson
Attorneys for State of Arizona

THOMAS A. GORMAN ATTORNEY AT LAW                              Sedona
      By    Thomas A. Gorman
Attorney for Edward James Rose
_____

**P E L A N D E R**, Justice

¶1      After fatally shooting a police officer, Edward James Rose pleaded guilty to two counts of first degree murder for that killing and to eight other felony counts.  He was sentenced to death on the murder counts and to prison terms on the other convictions.  We have jurisdiction over his automatic appeal

under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and -4033(A)(1).

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶2 On July 25, 2007, Rose stole a truck that contained a company's checkbook. Over the next three days, Rose conspired with others to forge and cash checks from the checkbook.

¶3 On July 27, Rose and his girlfriend smoked methamphetamine and drank beer most of the day. That night, they went out to cash forged checks. Rose had said earlier that day he would shoot anyone who tried to stop him. Armed with a gun, Rose entered a check cashing store and presented one of the company's checks to the cashier. She discovered the check was forged and called the police.

¶4 Shortly thereafter, Officer George Cortez, Jr. of the Phoenix Police Department arrived. The officer entered the store, approached Rose, and began to handcuff him. After his left hand was cuffed, Rose pulled out his gun and shot the officer twice, killing him. Rose ran from the store with the handcuffs dangling from his wrist. Surveillance cameras captured the shooting.

¶5 Early the next morning, officers went to a house where they suspected Rose was hiding. They eventually entered the house, discovered Rose hiding in a closet, and arrested him.

¶6 The State charged Rose with first degree murder of a

2

law enforcement officer, first degree felony murder, and other noncapital felonies. On the day Rose's trial was to begin, he pleaded guilty to all charges. After finding four aggravating factors in the aggravation phase, and receiving evidence in the penalty phase, the jury sentenced Rose to death.

## II. ISSUES ON APPEAL

### A. Arraignment and absence from jury prescreening

¶7 Rose argues that he was denied an arraignment and the ability to participate in the first three days of jury selection in violation of the Fifth, Sixth, and Fourteenth Amendments. Because Rose did not object below, we review for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

¶8 Contrary to Rose's first contention, the record indicates he was arraigned on August 17, 2007, when he entered a plea of "not guilty to all charges." A week earlier, he and his counsel received notice of the indictment, including the two first degree murder counts. He did not object below to any alleged flaws in the arraignment process, and he has not established any error in that process.

¶9 Rose's argument regarding his absence from the initial portions of jury selection is also meritless. A defendant is entitled to be present at all phases of a trial, including jury selection. Ariz. R. Crim. P. 19.2; *State v. Garcia-Contreras*,

3

191 Ariz. 144, 146 ¶ 8, 953 P.2d 536, 538 (1998). But a defendant "may waive the right to be present at any proceeding by voluntarily absenting himself or herself from it." Ariz. R. Crim. P. 9.1. And "a trial court may rely on counsel's waiver of a defendant's right to be present" in certain circumstances; "personal waiver by the defendant is not required." *State v. Canion*, 199 Ariz. 227, 234 ¶ 26, 16 P.3d 788, 795 (App. 2000); *see also State v. Collins*, 133 Ariz. 20, 23, 648 P.2d 135, 138 (App. 1982) ("Unless the circumstances are exceptional, a defendant is bound by his counsel's waiver of his constitutional rights." (citing *Henry v. Mississippi*, 379 U.S. 443 (1965); *State v. Rodriguez*, 126 Ariz. 28, 612 P.2d 484 (1980))).

¶10      The record reflects that Rose, through counsel, waived his presence for the first two days of jury selection, which involved the trial judge "time screening" potential jurors on the anticipated length of trial and their availability. Rose was under a medical quarantine for at least the first day, did not object to his absence on either day, and presents no exceptional circumstances that would render ineffective his attorney's waiver. On the third day, when the parties merely stipulated to which jurors did not need to return for additional questioning, the court granted defense counsel time to contact Rose before proceeding. Rose specifically told his attorney that he waived his presence. Rose was present on the next trial

4

day and throughout the rest of jury selection and trial. Even if we assume that Rose, absent his waiver, "was entitled to attend the [juror] prescreening process," *State v. Morris*, 215 Ariz. 324, 335 ¶ 45, 160 P.3d 203, 214 (2007), no fundamental error arose regarding Rose's absence from three days of that process.

## B.   Exclusion of non-English speaking jurors

¶11     Rose argues that the exclusion of non-English speaking jurors violated his Sixth and Fourteenth Amendment rights and that A.R.S. § 21-202(B)(3) is unconstitutional. That statute provides that persons "shall be excused temporarily from service as a juror if the judge or jury commissioner finds" that "[t]he prospective juror is not currently capable of understanding the English language." We have previously considered and rejected the arguments Rose makes. *See State v. Cota*, 229 Ariz. 136, 143 ¶¶ 13–16, 272 P.3d 1027, 1034 (2012).

## C.   Voluntariness of guilty plea

¶12     Rose argues on multiple grounds that his guilty plea was involuntary and not made knowingly and intelligently. This Court reviews a trial court's acceptance of a guilty plea for an abuse of discretion. *State v. Djerf*, 191 Ariz. 583, 594 ¶ 35, 959 P.2d 1274, 1285 (1998). We "must determine if reasonable evidence supports the finding that the defendant was competent to enter the plea" and will consider the facts "in a light most

5

favorable to sustaining the trial court's finding." *Id.* (internal quotation marks omitted).

**¶13** When accepting a guilty plea, the trial judge must ensure that the plea is entered voluntarily, intelligently, and knowingly. *Id.* To ensure this, Arizona Rule of Criminal Procedure 17.2 requires the court to "address the defendant personally in open court" and inform the defendant fully of his or her rights and the consequences of pleading guilty. "What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969). The trial court must ensure that the defendant understands:

> (1) the nature of the charges, (2) the nature and range of possible sentences, including any special conditions, (3) the constitutional rights waived by pleading guilty, (4) the right to plead not guilty, and (5) that the right to appeal is also waived if the defendant is not sentenced to death.

*Djerf*, 191 Ariz. at 594 ¶ 36, 959 P.2d at 1285; *see also* Ariz. R. Crim. P. 17.2; *Boykin*, 395 U.S. at 243.

**¶14** Rose first argues his plea was not voluntary because he was not arraigned and never received actual notice of the capital offenses to which he pleaded guilty. But as discussed above, *supra* ¶ 8, the record shows that, after receiving notice

6

of the indictment, Rose was arraigned and pleaded "not guilty to all charges."

¶15     At the subsequent change-of-plea proceeding, Rose acknowledged he had discussed with his counsel "the pros and cons" of pleading guilty and that it was his "free choice to plead guilty to these charges." The trial court expressly told Rose he had "several charges pending" against him, "with the most serious charges" being the two "first degree murder" counts, for which he could face "a death penalty." The court later repeated the first degree murder charges before asking Rose what his plea on each count was, to which he responded "[g]uilty."

¶16     These facts distinguish this case from *Henderson v. Morgan*, 426 U.S. 637 (1976), on which Rose relies. There, the defendant pleaded guilty to second degree murder without any "indication that the nature of the offense had ever been discussed with [him]." *Id.* at 642–43. No one informed the defendant that intent, an element that he explicitly denied, was required for the charged offense. *Id.* at 643.

¶17     Here, in contrast, Rose's attorney avowed, and Rose acknowledged, that she had discussed the charges and the consequences of pleading guilty with Rose, who did not dispute the factual basis of his plea or whether the required *mens rea* was sufficiently established. The trial court had no obligation

7

to advise Rose of each specific element of his crimes "[a]bsent the unique circumstances of *Henderson v. Morgan*." *State v. Devine*, 114 Ariz. 574, 575, 562 P.2d 1072, 1073 (1977); *cf. State v. Ovante*, 231 Ariz. 180, 185 ¶ 17, 291 P.3d 974, 979 (2013) ("The trial court was not required to explain the distinction between first and second degree murder and was free to accept the guilty plea if it was satisfied that the record established premeditation.").

¶18    Second, Rose argues the trial court failed to review a written plea agreement with him.  But no plea agreement existed or was required.  The law only requires Rose's plea to have been made voluntarily, intelligently, and knowingly, regardless of the existence of a formal plea agreement.  *See* Ariz. R. Crim. P. 17.1–17.3; *Boykin*, 395 U.S. at 242-44; *Djerf*, 191 Ariz. at 594 ¶ 35, 959 P.2d at 1285.

¶19    Third, without citing any pertinent authority, Rose argues that his plea was not voluntary because the trial court did not secure a waiver of his guilty except insane ("GEI") defense.  Such a waiver, however, was not required.  In accepting a guilty plea, a trial court need not "call to the attention of the accused every defense which might conceivably be suggested by the record."  *State v. Hickey*, 110 Ariz. 527, 529, 521 P.2d 614, 616 (1974).  Rose similarly argues that the court failed to inquire into his sanity at the time of the

8

shooting. Insanity, however, is an affirmative defense that a defendant must prove by clear and convincing evidence. A.R.S. § 13-502(A), (C). Again, the trial court had no duty to inform Rose of that potential defense, which he previously had alleged.

¶20 Fourth, Rose argues that the plea colloquy did not include any statement about his state of mind at the time of the shooting. To commit first degree murder of a police officer, one must intentionally or knowingly kill a law enforcement officer who is working in the line of duty. A.R.S. § 13-1105(A)(3); *State v. Cruz*, 218 Ariz. 149, 169 ¶ 129, 181 P.3d 196, 216 (2008). In the change-of-plea proceeding, Rose's attorney recited the following relevant facts:

> [O]n or about July 27th, 2007, my client, Edward James Rose, entered the Southwest Check Cashing Store on 83rd Avenue and about Encanto. He entered that particular facility . . . for the purpose of cashing a forged check . . . .
>
> When he entered that facility he had a gun on his person. While in the check cashing store Police Officer George Cortez, Jr. arrived, and in the line of duty, and he was in the line of duty, it was at that time that my client, using the gun that he had on his person, turned, shot and killed Officer George Cortez, Jr.

¶21 Arizona Rule of Criminal Procedure 17.3 requires the court to "determine that there is a factual basis for the plea." "A factual basis can be established by 'strong evidence' of guilt and does not require a finding of guilt beyond a

9

reasonable doubt." *State v. Salinas*, 181 Ariz. 104, 106, 887 P.2d 985, 987 (1994) (quoting *State v. Wallace*, 151 Ariz. 362, 365, 728 P.2d 232, 235 (1986)). Furthermore, "[t]he evidence of guilt may be derived from any part of the record including presentence reports, preliminary hearing transcripts, or admissions of the defendant." *Id.; see also Ovante*, 231 Ariz. at 184 ¶ 12, 291 P.3d at 978.

¶22 The factual basis Rose presented at the change of plea proceeding shows that Officer Cortez was on duty at the time of the murder and that Rose intentionally or knowingly shot and killed him. Rose argues, however, that earlier in the case he had maintained to various mental health experts that he did not know Officer Cortez was a police officer when he shot him, but rather believed he was a security guard. But Rose made inconsistent statements, and aggravation phase testimony established that Officer Cortez was wearing his police uniform with badge and was handcuffing Rose when Rose shot him.

¶23 Additionally, the trial court viewed the store's surveillance video footage that was admitted into evidence in the aggravation phase, and it showed Rose looking over his shoulder as Officer Cortez entered the store. Thus, if the factual basis at the change of plea proceeding did not adequately establish Rose's mental state at the time he shot Officer Cortez, other evidence in the record sufficiently shows

10

that Rose knew that Officer Cortez was a police officer. Moreover, even if we assume that the factual basis was inadequate for the first degree murder charge arising from Rose's killing of an on-duty police officer, Rose does not challenge the factual basis for his plea of guilty to the felony murder charge. *Cf. State v. Rios*, 217 Ariz. 249, 251 ¶ 8, 172 P.3d 844, 846 (App. 2007) ("The only intent required for felony murder is the intent required to commit the underlying felony." (citing A.R.S. § 13-1105(B))).

**¶24**    Fifth, Rose argues that he "suffered from mental and emotional instability," which led to his "impromptu" guilty plea on the day the guilt phase trial was set to begin. Rose points to his low IQ of 77 and his impaired problem-solving skills as evidence of his "substantially below average intelligence." He also relies on *United States v. Christensen*, in which the Ninth Circuit said that, "[i]n cases where the defendant's mental or emotional state is a substantial issue," district courts must conduct fuller colloquies. 18 F.3d 822, 825 (9th Cir. 1994).

**¶25**    *Christensen* is inapplicable here. That case involved a written jury trial waiver pursuant to Federal Rule of Criminal Procedure 23(a) and an abbreviated colloquy. This case, in contrast, involves an in-court guilty plea accepted by the judge after a colloquy that satisfied Rule 17.2. Additionally, although the trial judge might have been aware of Rose's subpar

11

intelligence, there is no indication that the judge ever suspected Rose was incompetent.

¶26    Rose nonetheless argues the trial court erred by disregarding some indications of incompetence and failing to hold a competency hearing before accepting his plea. We have stated that "we will not uphold a guilty plea, where competency has been a valid issue, absent a proper finding of competency." *State v. Bishop*, 139 Ariz. 567, 571, 679 P.2d 1054, 1058 (1984); *see also State v. Brewer*, 170 Ariz. 486, 495, 826 P.2d 783, 792 (1992) ("A criminal defendant is not competent to plead guilty if [his] mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and understand the nature of the consequences of his plea." (internal quotation marks omitted)). But a competency evaluation and hearing are not required in all cases in which the defendant pleads guilty. *Cf. State v. Wagner*, 114 Ariz. 459, 462-63, 561 P.2d 1231, 1234-35 (1977) (when the record raised "sufficient doubt of defendant's competency to enter a plea of guilty" to first degree murder, case was remanded for a post-conviction hearing to determine whether he made "a rational and reasoned decision in entering the plea").

¶27    Either party may request a competency hearing. Ariz. R. Crim. P. 11.2. But if preliminary mental health reports and other evidence provide no reasonable grounds to justify a

12

competency hearing, no such hearing is required. *Cf. Djerf*, 191 Ariz. at 592 ¶¶ 26-28, 959 P.2d at 1283 (upholding trial court's finding, without a Rule 11 hearing, that the defendant validly waived his right to counsel when mental health expert's prescreening report did not question defendant's competency).

¶28     After he was charged, Rose initially waived his right to have a mental health expert appointed pursuant to Rule 11 for a prescreening under A.R.S. § 13-754(A)(1).  The issue of competency did not arise until almost two years later, after defense expert Dr. Pablo Stewart first met with Rose.  Although he considered Rose "psychotic," Dr. Stewart reported that he "never felt that [Rose] was incompetent," and that "his symptoms have not prevented him from fully assisting counsel or understanding his legal proceedings."  Neither Rose nor the court pursued any further testing or evaluations concerning Rose's competency.  Nor did any expert (including Dr. Heather Gulino, the court's appointed expert who evaluated Rose's GEI defense) suggest Rose was incompetent to either stand trial or plead guilty.  And, as the State aptly notes, "Rose has not disputed that he was competent to participate in his defense during jury selection before his guilty pleas, or during the aggravation and penalty phases of trial that followed them."  On this record, no competency hearing was required before the trial court accepted Rose's guilty pleas.

13

¶29 Sixth, Rose argues that the trial court's colloquy failed to secure a knowing, intelligent, and voluntary waiver of three constitutional rights: the privilege against self-incrimination, the right to trial by jury, and the right to confront one's accusers.

¶30 The record clearly reflects that the trial judge informed Rose of those rights and that Rose waived them. Rose nonetheless contends that the trial court's recitation of rights and his waiver referred only to the noncapital counts and that the court thus failed to secure a waiver of constitutional rights on the capital charges. Although the trial court's colloquy could have been clearer, the record, when viewed reasonably and in context, does not support Rose's argument.

¶31 "The requirements of *Boykin* are met when it appears from a consideration of the entire record that the accused was aware that he was waiving [his constitutional] rights and it appears that it was a knowing and voluntary waiver." *State v. Henry*, 114 Ariz. 494, 496, 562 P.2d 374, 376 (1977). When defense counsel informed the trial court in chambers that Rose had decided to plead guilty to all charges, counsel assured the court that they had "been working with [Rose] for a very long period of time" and, after much discussion during the previous few weeks, Rose had decided "to take responsibility and plead guilty to all of the charges that are in the indictment." When

14

the judge asked if that was a voluntary choice on Rose's part, his attorney responded, "Absolutely. It's not something that he thought of overnight. We've talked about it, discussed the pros and cons, consulted with him, and that's exactly what he wants to do."

¶32    After returning to the courtroom, the judge asked Rose if it was his "intention . . . to plead guilty to the charges," to which Rose responded, "Yes, sir." Rose acknowledged that he had been in the same courtroom several times before and had "seen other defendants plead guilty."[1] The judge explained that he was "going to go through the same type of colloquy with you that you've observed me go through with [those] defendants." The judge asked Rose if he "had an opportunity to discuss with [his] lawyer the pros and cons" of pleading guilty, to which Rose responded, "Yes, sir." Rose also acknowledged that it was his "free choice to plead guilty to these charges."

¶33    The trial court then set forth the range of possible sentences for all charged offenses, both capital and noncapital. The court also explained that Rose had "the absolute right to have this jury determine whether or not you are guilty or not guilty on these charges," to "cross-examine all of the

---

[1]    Although not dispositive on whether Rose's pleas in this case were valid, we also take judicial notice that he pleaded guilty to an unrelated armed robbery two months earlier, when the same superior court judge advised Rose of all pertinent constitutional rights, which he waived.

15

government's witnesses [and] subpoena witnesses . . . to . . . testify [on] your behalf," and "to remain silent," and that "the government could not comment on your silence." In its concluding statement, which is the lynchpin of Rose's argument, the court told him, "By pleading guilty to me here today, for the non-capital charges you would be giving up all of these important rights." Rose stated that he understood his rights and still chose to proceed with his guilty pleas.

¶34     In context, the trial court's statements to Rose cannot reasonably be construed as limiting the admonition regarding the constitutional rights Rose was waiving to the noncapital charges. Viewed as a whole and in the light most favorable to sustaining the court's acceptance of Rose's pleas, the record reflects that Rose understood his constitutional rights and validly waived them on all charges. *See State v. Allen*, 223 Ariz. 125, 127 ¶ 13, 220 P.3d 245, 247 (2009).

¶35     Seventh, describing himself as "seriously mentally ill," Rose argues that "[t]he trial court's failure to inquire and determine whether . . . [he] was on medication or not and how the presence or absence of medication affected his decision making ability renders the plea unknowing and unintelligent" and a violation of due process. Rose relies on *United States v. Cole*, in which the Third Circuit stated that

    Rule 11 counsels a district court to make further

16

inquiry into a defendant's competence to enter a guilty plea once the court has been informed that the defendant has recently ingested drugs [in this case heroin] or other substances capable of impairing his ability to make a knowing and intelligent waiver of his constitutional rights.

813 F.2d 43, 46 (3d Cir. 1987).

¶36    We agree that a trial judge has a duty to "make further inquiry into a defendant's competence" when the judge is aware that the defendant might be under the influence of any substance, including medication, "capable of impairing his ability to make a knowing and intelligent waiver of his constitutional rights." *Id.* But in *Cole* the trial judge was informed during the colloquy that the defendant had ingested drugs the previous night, yet the judge accepted the plea without further inquiry. *Id.* Here, however, the only notice the trial judge had were two reports of Dr. Gulino filed in May and June 2010, indicating that Rose had begun a medication regimen in either February or March 2010. That information did not necessarily obligate the trial judge to inquire further into Rose's competency or reject his guilty plea.

¶37    At the end of the change of plea proceeding, the judge asked if "any of the lawyers have any concerns about the voluntariness of Mr. Rose's pleas of guilty." The prosecutor responded that he did not, and neither Rose nor his counsel expressed any concerns. Nonetheless, the better practice is for

17

judges to routinely inquire whether a pleading defendant is on any medication or other substance that might impair the defendant's ability to enter a plea. *See* Ariz. Civil/Criminal Bench Book, Guilty Plea, 10-3 (2013) (listing a series of questions a judge should ask when accepting a guilty plea, including inquiry into whether defendant "had any drugs, alcohol, or medication within the past 24 hours"). Despite that omission in the trial court's colloquy here, absent anything in the record casting doubt on Rose's competency, we cannot conclude the court abused its discretion in finding Rose's guilty pleas and waiver of rights valid.

¶38    Finally, Rose argues that the trial court erred by not informing him that "he was waiving his right of appellate review on his conviction of the capital counts if he pled guilty." But no such warning was required because Rose did not, and could not, forego his right to appeal his capital convictions by pleading guilty. *See* A.R.S. § 13-756(A) ("The supreme court *shall* review *all* death sentences . . . ." (emphasis added)); *see also* A.R.S. § 13-4033(B) (the right to appeal is lost only when a defendant pleads guilty in "noncapital" cases); Ariz. R. Crim. P. 31.2(b) ("When a defendant has been sentenced to death, the clerk . . . shall file a notice of appeal on his behalf at the time of entry of judgment and sentence."); *Ovante*, 231 Ariz. at 184 ¶ 10, 291 P.3d at 978 ("In death penalty cases, consistent

18

with Rule 31.2(b), this Court will review the validity of a plea on direct appeal, before it reviews the capital sentence."). Rule 17.2(e) states that a defendant who pleads guilty "will waive the right to have the appellate courts review the proceedings" only in a "noncapital" case. In addition, our review on direct appeal of Rose's arguments relating to his guilty pleas and his absence from the initial stages of jury selection refutes his claim that he waived appellate review of his capital convictions.

¶39 In sum, we find that Rose's guilty pleas were entered voluntarily, intelligently, and knowingly.

## D. Victim impact evidence

¶40 Rose argues that the admission of "inflammatory" victim impact evidence ("VIE") in the penalty phase violated his Eighth Amendment rights because it was not relevant to any mitigating circumstances and was unduly prejudicial. Rose also challenges the constitutionality of A.R.S. § 13-752(R) and Arizona Rule of Criminal Procedure 19.1(d)(3). We consider the constitutionality of a statute or rule de novo. *State v. Roque*, 213 Ariz. 193, 217 ¶ 89, 141 P.3d 368, 392 (2006).

¶41 Section 13-752(R) states that "[a] victim has the right to be present . . . at the penalty phase" and may "present information about the murdered person and the impact of the murder on the victim and other family members and may submit a

19

victim impact statement in any format to the trier of fact." Similarly, Rule 19.1(d)(3) permits the victim's survivors to "make a statement relating to the characteristics of the victim and the impact of the crime on the victim's family," but the victim's survivors "may not offer any opinion regarding the appropriate sentence to be imposed." Thus, under the statute and rule, a victim's survivors may present information in the penalty phase about the victim and discuss the impact of the murder on them. *See also* Ariz. Const. art. 2, § 2.1(A)(4) (giving crime victims the right to be heard at sentencing); A.R.S. § 13-4426 (authorizing crime victims to present at sentencing "any information or opinions that concern the victim or the victim's family, including the impact of the crime on the victim [and] the harm caused by the crime").

¶42 The United States Supreme Court has recognized that VIE is constitutionally permissible. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) ("[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." (alteration in original) (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting))). In addition, this Court has rejected

20

the argument that VIE is not relevant to a jury's consideration of mitigating evidence. *See State v. Ellison*, 213 Ariz. 116, 140–41 ¶¶ 111–14, 140 P.3d 899, 923–24 (2006) ("These statements are relevant to the issue of the harm caused by the defendant . . . [and] do not violate the Eighth Amendment." (citing *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 17, 68 P.3d 412, 417 (2003))); *see also State v. Tucker* (*Tucker II*), 215 Ariz. 298, 320 ¶ 92, 160 P.3d 177, 199 (2007) ("Evidence about the victim and the effect of the crime on the victim's family is [also] admissible during the penalty phase as rebuttal to the defendant's mitigation evidence."). Based on this controlling authority, we reject Rose's constitutional argument. *See Roque*, 213 Ariz. at 222 ¶ 116, 141 P.3d at 397 (declining to revisit precedent finding VIE constitutional because defendant "provides no compelling argument for [the Court] to stray from [its] prior course").

¶**43**    Turning to the VIE presented in this case, Rose first argues that the entire VIE presentation was overly emotional and highly prejudicial. Rose, however, did not object below on these grounds or move for a mistrial, and therefore fundamental error review applies. *State v. Valverde*, 220 Ariz. 582, 585 ¶ 12, 208 P.3d 233, 236 (2009).

¶**44**    The extensive VIE in this case consisted of prepared statements from Officer Cortez's widow, oldest son (whose

21

written statement the widow read while the boy and his younger brother stood next to her), mother, and father-in-law. The VIE also included a short poem read by Officer Cortez's mother, the playing of a thirty-five second audio recording, and several photographs. Without question, the scripted VIE was quite emotional and forceful in its tone and tenor, and even the State concedes that the widow's statements were "admittedly emotional."

¶45 VIE is generally admissible at sentencing unless it is "so unduly prejudicial that it renders the trial fundamentally unfair." *State v. Dann* (*Dann II*), 220 Ariz. 351, 369 ¶ 98, 207 P.3d 604, 622 (2009) (quoting *Payne*, 501 U.S. at 825). Our prior cases guide our analysis of the VIE presented here. For example, we did not find undue prejudice when the victim's parents spoke emotionally about the impact of their son's death on them, followed by playing of the 911 call the victim's father made after he discovered his son murdered. *State v. Gallardo*, 225 Ariz. 560, 567 ¶¶ 27, 29, 242 P.3d 159, 166 (2010). Nor did we find undue prejudice when at least half the jurors cried during a "powerful and emotional" victim impact presentation, and the presenters all cried during their statements as well. *State v. Glassel*, 211 Ariz. 33, 54 ¶¶ 85-86, 116 P.3d 1193, 1214 (2005). We likewise did not find undue prejudice when the victim's mother compared the pain she felt over her daughter's

22

murder to the "universally painful" loss experienced by all Americans in response to the 9/11 terrorist attacks. *State v. Garza*, 216 Ariz. 56, 69 ¶¶ 61-62, 163 P.3d 1006, 1019 (2007).

¶46    Unlike those cases in which we reviewed the trial court's admission of VIE for abuse of discretion, however, in this case we review for fundamental, prejudicial error because Rose did not object below on the broad grounds he urges now. *Roque*, 213 Ariz. at 221 ¶ 113, 141 P.3d at 396. Here, the trial court instructed the jurors they "must not be influenced" by "passion, prejudice, public opinion, or public feeling," nor "swayed by mere sympathy not related to the evidence presented." But we have not yet been confronted with VIE as extensive as that presented in this case, and we find the presentation here troubling. There is no simple, mechanical test to determine when VIE crosses the line between permissible and unduly prejudicial. The presentation here, however, comes uncomfortably close to that line. Nonetheless, absent any objection or motion for mistrial, on this record we cannot say that the trial court fundamentally erred in admitting the VIE regarding the survivors' losses or in not *sua sponte* excluding it as overly inflammatory or unduly prejudicial. "Senseless murders usually generate strong emotional responses" manifested in VIE. *Glassel*, 211 Ariz. at 54 ¶ 86, 116 P.3d at 1214.

¶47    It remains the responsibility of the trial judge,

23

however, "to exercise sound discretion in balancing probative value against the risk of unfair prejudice." *Ellison*, 213 Ariz. at 141 ¶ 115, 140 P.3d at 924 (quoting *State v. Doerr*, 193 Ariz. 56, 64 ¶ 32, 969 P.2d 1168, 1176 (1998)). We caution prosecutors and victims not to venture too close to the line, lest they risk a mistrial. And, recognizing the confines of A.R.S. § 13-4426.01 but also a defendant's constitutional rights, we encourage judges, in their sound discretion, to screen and, if necessary, limit an orchestrated, overly dramatic VIE presentation "that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825.

¶48    At trial, before presentation of the VIE, Rose objected to three aspects: the appearance of Officer Cortez's two young sons dressed in attire that looked like police uniforms, two photographs that were admitted into evidence and shown to the jury during the widow's statement, and the playing of an audio recording called the "Last Call." We review the trial court's rulings on those particular VIE-related objections for abuse of discretion. *Garza*, 216 Ariz. at 69 ¶ 60, 163 P.2d at 1019.

¶49    Regarding the children's attire, Rose objected that "the officer's sons . . . are dressed in -- I can't say police uniform, but certainly something that looks like police uniform." The trial judge noted the objection but declined to

24

require the children to change clothes. Nothing in the record, and no authority cited by Rose, suggests the court abused its discretion in that regard.

¶50    Nor can we say the trial court erred in overruling Rose's objections to two photographs, one of which depicted Officer Cortez's sons and widow looking down into the grave as his casket was lowered, and the other photograph showing the boys, with their backs to the camera, sitting on a bench by the gravesite. Rose objected because, he argued, the photographs showed no interplay between the children and their father and appeared staged. This Court has recognized "the danger that photos of the victims may 'be used to generate sympathy for the victim and his or her family.'" *Ellison*, 213 Ariz. at 141 ¶ 115, 140 P.3d at 924 (quoting *Doerr*, 193 Ariz. at 64 ¶ 32, 969 P.2d at 1176). Nonetheless, we have declined "to adopt a per se rule barring all in-life photos in capital murder cases," leaving the decision instead to the trial court's discretion. *Id.* Generally, "[w]hen assessing the admissibility of photographs, we 'consider the photographs' relevance, the likelihood that the photographs will incite the jurors' passions, and the photographs' probative value compared to their prejudicial impact.'" *State v. Pandeli*, 215 Ariz. 514, 524 ¶ 23, 161 P.3d 557, 567 (2007) (quoting *State v. McGill*, 213 Ariz. 147, 154 ¶ 30, 140 P.3d 930, 937 (2006)).

¶51    As noted above, under Arizona's constitution, statutes, and court rules, survivors may speak at sentencing about the effect the victim's murder has had on them. And Arizona cases have permitted pre-murder, in-life photographs of the homicide victim, *Garza*, 216 Ariz. at 69 ¶ 63, 163 P.3d at 1019, as well as post-death autopsy photographs of the victim, *Pandeli*, 215 Ariz. at 524-25 ¶¶ 24-26, 161 P.3d at 567-68. But no Arizona case has addressed the admissibility of photographs of the victim's survivors, ostensibly to depict their response to the victim's death and its effect on them. Some California cases, however, have upheld admission in a capital case of photographs of the victim's gravesite. *See, e.g.*, *People v. Zamudio*, 181 P.3d 105, 137 (Cal. 2008) (permitting a series of pre-death photographs of the victims, as well as three photographs of the victims' grave markers); *People v. Kelly*, 171 P.3d 548, 570 (Cal. 2008) (permitting a video montage that ended with a close-up of victim's grave); *People v. Harris*, 118 P.3d 545, 574 (Cal. 2005) (permitting a photograph of the victim's gravesite as "further evidence relating to her death and the effect upon her family").

¶52    The two photographs in question arguably were relevant to show the impact Officer Cortez's death had on his two young sons. *See State v. Oliver*, 158 Ariz. 22, 28, 760 P.2d 1071, 1077 (1988) (noting that the "standard of relevance is not

26

particularly high"). The trial court, however, would have acted well within its discretion had it excluded those photographs, given their marginal relevance, the danger of unfair prejudice their admission posed, and the extensive, clearly permissible VIE already presented. *See* Ariz. R. Evid. 403; *cf. McGill*, 213 Ariz. at 157 ¶ 40, 140 P.3d at 940 (interpreting former A.R.S. § 13-703(C) to impose on penalty phase evidence a relevance requirement that involves "fundamentally the same considerations as does a relevancy determination under Arizona Rule of Evidence 401 or 403"). Nonetheless, we cannot say that the trial court abused its discretion in admitting the photographs after implicitly finding, over Rose's Rule 403 objection, that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. After all, the jury was well aware, without the photographs, that the murder caused the two boys to suffer a devastating loss of their father's love, affection, and support for the rest of their lives.

¶53 Regarding the "Last Call" audio recording,[2] Rose argued

---

[2] The "Last Call" is thirty-five seconds long and contains the following message transmitted through a radio call: "All units stand by for a broadcast. This is the last call for Officer George Cortez, Jr., number 8232, 834 Henry. 834 Henry is 236290 West Northern. 834 Henry you're now 10-7. Rest in peace. You'll be greatly missed. Goodnight sir. Stations clear for [audio cuts out]."

below that it was "irrelevant" and "put together purely for . . . an emotional impact." We have not addressed this type of issue before, but other jurisdictions have. In *State v. Bixby*, the South Carolina Supreme Court permitted a videotape depicting a deputy sheriff's funeral, including footage of an American flag over the closed coffin, the playing of "Taps," assembly of mourners, and a recording of a fictional 911 call in which the deputy is given permission to "return home." 698 S.E.2d 572, 586-87 (S.C. 2010). The court reasoned that the "videotape was relevant to show the uniqueness of the victim, the harm committed by [the defendant], and the impact of the victim's death on his family and society." *Id.* at 587; *see also People v. Brady*, 236 P.3d 312, 338-39 (Cal. 2010) (permitting the admission of a six-minute videotape highlighting the memorial and funeral services of the police officer victim). Although the relevance of the "Last Call" recording is dubious, the trial court did not abuse its discretion in admitting it as part of the VIE inasmuch as the recording was very brief and was not inflammatory in either its content or style of presentation.

¶**54**     On appeal, Rose also argues that "[t]he entire victim presentation linked the case not to the slain officer but to the entire police force." Because he did not raise this claim below, we review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

28

¶55      Rose is correct that victim impact statements are limited to the "impact of the crime on the victim's *family*." Ariz. R. Crim. P. 19.1(d)(3) (emphasis added).  But VIE is permissible partly because it allows the jury to see the victim as a unique individual.  *See Payne*, 501 U.S. at 825.  Officer Cortez was a member of the Phoenix Police Department, and his occupation as a police officer is part of what made him who he was.  The only people who spoke during the VIE were members of Officer Cortez's family, and they gave personal reflections on how his death affected them individually.  Some portions of the VIE inappropriately mentioned the effect the victim's death had on his fellow law enforcement officers and more broadly the community as a whole.  But those brief comments were merely a by-product of Officer Cortez's occupation and, on this record, do not constitute fundamental, prejudicial error.

¶56      Rose further argues for the first time on appeal that the victims improperly asked the jury to impose the death penalty.  We review for fundamental error because Rose made no such claim below.  *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶57      Although VIE generally is permitted, the victim's survivors "may not offer any opinion regarding the appropriate sentence to be imposed."  Ariz. R. Crim. P. 19.1(d)(3); *see also State v. Bocharski*, 200 Ariz. 50, 62 ¶ 64, 22 P.3d 43, 55 (2001)

("Sentencing recommendations offered by a deceased's survivors have no relevance in a capital case."). Officer Cortez's widow clearly used some pejorative language in her statement, describing Rose at the end as a "cop killer," and requesting the jury to "give the appropriate sentence." But, contrary to Rose's assertions, neither Officer Cortez's widow nor his son recommended a sentence or said they "wanted Rose put to death." And the trial court instructed the jury that the victim's family members were "not allowed to offer any opinion or recommendation regarding the sentence to be imposed." Rose still contends that they spoke in "clear and understandable code" to urge the jury to return a death sentence. But absent any such express request, and in view of the court's instruction, we find no fundamental error arising from the widow's statements.

¶58        Nonetheless, we do not condone the type of vengeful language the widow used. And we strongly encourage prosecutors and trial courts to prevent VIE presenters from alluding to or addressing in any way the potential sentence, such as pressing for an "appropriate" or "just" sentence or asking for "closure." Such references come dangerously close to infringing Rule 19.1(d)(3) and mandating a mistrial.

¶59        Finally, Rose unsuccessfully proffered two items of evidence to rebut the VIE. He sought to present a petition for divorce filed by Officer Cortez's wife and an episode of the

"Dr. Phil Show" featuring her and Officer Cortez. The trial court sustained the State's objection to both. "We review a trial court's determination of relevance and admissibility of evidence for an abuse of discretion." *State v. Hardy*, 230 Ariz. 281, 291 ¶ 49, 283 P.3d 12, 22 (2012).

¶60        A.R.S. § 13-4426.01 states that "the victim's right to be heard is exercised not as a witness, . . . and the victim is not subject to cross-examination." *See also State ex rel. Thomas v. Foreman*, 211 Ariz. 153, 155 ¶ 6, 118 P.3d 1117, 1119 (App. 2005) ("The plain language of the statute gives victims the right to be heard at a sentencing hearing without being cross-examined by the State or the defendant." (footnote omitted)). The statute further provides that "the defense shall be afforded the opportunity to explain, support or deny the victim's statement." A.R.S. § 13-4426.01. In *State v. Martinez*, we considered a similar challenge by a defendant contesting the truthfulness of the victim impact statements and his right to confront the victim. 218 Ariz. 421, 431–32 ¶ 45, 189 P.3d 348, 358–59 (2008). We held that "victim impact evidence is not put on by the State, nor is cross-examination permitted." *Id.* at 432 ¶ 45, 189 P.3d at 359.

¶61        Rose sought to offer this evidence as mitigation more than two weeks after the VIE had been presented. The trial court ruled that "whether Ms. Cortez and her husband had marital

31

difficulties at some point is simply not relevant mitigation," and that nothing Officer Cortez's wife said was "materially inaccurate." Therefore, the court concluded, the proffered evidence was not relevant to rebut her statement. Applying factors set forth in Evidence Rule 403, the trial court also ruled that litigating issues relating to the Cortezes' marriage "would involve undue delay and waste of time on what is essentially a collateral matter," and that those considerations "substantially outweighed" any probative value the proffered evidence had.

¶62       "The trial court has considerable discretion in determining the relevance and admissibility of evidence, and we will not disturb its ruling absent a clear abuse of that discretion." *State v. Amaya-Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990). Balancing of Rule 403 factors is also a matter particularly and appropriately left to the trial court's discretion. *Id.* We find no abuse in the trial court's decision to preclude evidence during Rose's mitigation of marital difficulties between Officer Cortez and his wife.

**E.   Exclusion of execution impact testimony**

¶63       Rose argues that the trial court erred in excluding his proffered execution impact evidence, which he claims is relevant under the Eighth Amendment and admissible as a matter of due process. This Court reviews evidentiary rulings for an

32

abuse of discretion and gives deference to the trial court's determination of relevance.  *State v. Chappell*, 225 Ariz. 229, 238 ¶ 28, 236 P.3d 1176, 1185 (2010).

**¶64** "We have previously held that execution impact evidence is not relevant to mitigation."  *Id.* ¶ 30 (citing *Roque*, 213 Ariz. at 222 ¶ 119, 141 P.3d at 397).  Such execution impact evidence is not relevant because it is "altogether unrelated to defendant, to his character, or to the circumstance of the offense."  *Roque*, 213 Ariz. at 222 ¶ 119, 141 P.3d at 397 (quoting *State v. Williams*, 183 Ariz. 368, 385, 904 P.2d 437, 454 (1995)).

**¶65** Rose nonetheless contends that this Court has upheld the admissibility of execution impact evidence in prior cases.[3] But we also noted in *Chappell* that "[a]lthough similar evidence has been admitted in some cases, in none of those cases was the admissibility of the execution impact evidence at issue on appeal."  225 Ariz. at 238 ¶ 30 n.8, 236 P.3d at 1185 n.8.  Rose neither cites nor challenges *Chappell*.  Finding it dispositive,

---

[3]    To the extent Rose argues that "his family ties and the love of a defendant's family[] has been held by this Court to be mitigation," we agree that "[t]he existence of family ties is a mitigating factor."  *State v. Moore*, 222 Ariz. 1, 22 ¶ 134, 213 P.3d 150, 171 (2009).  At trial, Rose was permitted to present, and in fact did present, testimony from friends and family expressing their love for him.  What Rose could not present, and what the trial court properly prohibited, was testimony or argument related to the effect Rose's death would have on his friends and family.

we uphold the trial court's exclusion of execution impact evidence.

**F.  Constitutionality of A.R.S. § 13-751(F)(10)**

¶66     Rose argues that the (F)(10) aggravating factor violates the Eighth and Fourteenth Amendments on its face and as applied.  Because Rose did not raise this claim below, we review it for fundamental error.  *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶67     A.R.S. § 13-751(F)(10) provides that it shall be an aggravating circumstance when "[t]he murdered person was an on duty peace officer who was killed in the course of performing the officer's official duties and the defendant knew, or should have known, that the murdered person was a peace officer."  The killing of a police officer is a proper aggravating circumstance.  *See also Roberts v. Louisiana*, 431 U.S. 633, 636 (1977) ("[T]he fact that the murder victim was a peace officer performing his regular duties may be regarded as an aggravating circumstance."); *Cruz*, 218 Ariz. at 170 ¶ 132, 181 P.3d at 217 ("Killing a person one knows to be a peace officer who is acting in the line of duty adequately narrows the class of persons subject to the death penalty.").

¶68     We reject Rose's arguments that the (F)(10) aggravating factor draws an "arbitrary" and "irrational" distinction between a peace officer and a non-peace officer and

34

that the factor violates equal protection and due process principles. As in *Cruz*, Rose "cites no authority suggesting that the legislature may not provide that any intentional killing of an on-duty peace officer should make a defendant death eligible." 218 Ariz. at 170 ¶ 132, 181 P.3d at 217. "[S]pecification of punishment for crime is peculiarly a question of legislative policy," and this Court will presume the constitutionality of a statute "when there is a reasonable, even though debatable, basis for the enactment of a statute." *State v. Arnett*, 119 Ariz. 38, 47–48, 579 P.2d 542, 551–52 (1978). The legislature properly exercised its power and did not offend constitutional requirements by enacting the (F)(10) aggravating factor. *Cf. State v. Nelson*, 229 Ariz. 180, 186-87 ¶¶ 25-28, 273 P.3d 632, 638-39 (2012) (reaching same conclusion regarding A.R.S. § 13-751(F)(9)).

¶69    Likewise, we reject Rose's argument that application of the (F)(10) aggravating factor is cruel and unusual. The Supreme Court has stated that we must refer to "the evolving standards of decency that mark the progress of a maturing society" to determine whether particular punishments are cruel and unusual. *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality opinion)). Rose has not persuaded us that Arizona's (F)(10) aggravating factor fails to conform to that standard. On the

contrary, he acknowledges that several other states also recognize the murder of an on-duty peace officer as an aggravating factor. *See, e.g.*, Cal. Penal Code § 190.2(a)(7); Neb. Rev. Stat. § 29-2523(1)(i). Thus, we reject Rose's constitutional challenge to § 13-751(F)(10) and find no fundamental error in its application here. *Cf. Nelson*, 229 Ariz. at 188 ¶ 33, 273 P.3d at 640 (rejecting Eighth Amendment challenge to § 13-751(F)(9) when other jurisdictions also consider victim's age as "a factor in sentencing a defendant to death").

### III.  ABUSE OF DISCRETION REVIEW

¶70     Because the murder occurred after August 1, 2002, we review the jury's finding of aggravating circumstances and the imposition of a death sentence for abuse of discretion. A.R.S. § 13-756(A). "A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if 'there is any reasonable evidence in the record to sustain it.'" *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (2011) (quoting *Morris*, 215 Ariz. at 341 ¶ 77, 160 P.3d at 220).

### A.   Constitutionality of A.R.S. § 13-756(A)

¶71     Rose contends that review of a capital sentence for abuse of discretion violates the Eighth Amendment because the Supreme Court mandates "meaningful" appellate review of death sentences under *Gregg v. Georgia*, 428 U.S. 153 (1976). We have

36

previously rejected similar Eighth Amendment challenges to the statute and again do so here. *See Cota*, 229 Ariz. at 153 ¶ 92, 272 P.3d at 1044 ("Meaningful appellate review requires only that an appellate court 'consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed,' not whether the appellate court itself would have imposed a death sentence." (quoting *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990))); *Martinez*, 218 Ariz. at 434 ¶ 62, 189 P.3d at 361.

## B.   Aggravating circumstances

¶72    The jury found the following four aggravating circumstances proven beyond a reasonable doubt:  (1) Rose was previously convicted of a serious offense, A.R.S. § 13-751(F)(2); (2) Rose committed the offense as consideration for the receipt or in expectation of the receipt of anything of a pecuniary value*, id.* § 13-751(F)(5); (3) Rose committed the offense while on probation for a felony offense*, id.* § 13-751(F)(7); and (4) the murdered person was an on-duty police officer killed in the course of performing the officer's official duties and Rose knew or should have known the victim was a peace officer*, id.* § 13-751(F)(10).   Rose does not contest, and substantial evidence in the record supports, the jury's findings of the (F)(2), (F)(7), and (F)(10) aggravating circumstances.    But he does challenge the (F)(5) finding

37

regarding pecuniary gain.  We will affirm the jury's finding "if there is any reasonable evidence in the record to sustain it," *Morris*, 215 Ariz. at 341 ¶ 77, 160 P.3d at 220 (internal quotation marks omitted), and view the evidence in the light most favorable to upholding the jury's finding, *State v. Andriano*, 215 Ariz. 497, 506 ¶ 41 n.5, 161 P.3d 540, 549 n.5 (2007).

### 1.  (F)(5) aggravating factor – pecuniary gain

**¶73**    A defendant convicted of first degree murder is eligible for a death sentence if the state proves beyond a reasonable doubt that he "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."  A.R.S. § 13-751(F)(5).  The jury may find this aggravator only "if the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder."  *State v. Lamar*, 210 Ariz. 571, 574 ¶ 11, 115 P.3d 611, 614 (2005) (quoting *State v. Hyde*, 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996)).  "This proof may be either by 'tangible evidence or strong circumstantial inference.'"  *State v. Cañez*, 202 Ariz. 133, 159 ¶ 91, 42 P.3d 564, 590 (2002) (quoting *Hyde*, 186 Ariz. at 280, 921 P.2d at 683).

**¶74**    Pecuniary gain "does not require a motive to kill" as long as there is a "causal connection between the pecuniary gain objective and the killing," such as to "facilitate escape or

38

hinder detection and thus advance the underlying pecuniary gain objective." *Cañez*, 202 Ariz. at 159 ¶¶ 93–94, 42 P.3d at 590; *see also Ellison*, 213 Ariz. at 143 ¶ 125, 140 P.3d at 926 (finding (F)(5) aggravator established when defendant planned a burglary and killed victims to escape and avoid identification).

¶75 Rose argues that his attempted theft in the check cashing store had "failed before the police officer arrived," and he "received no money and was not going to receive any money from the clerk." But "an absence of actual receipt of money or valuables [does not] negate[] a finding of expectation of pecuniary gain as an aggravating circumstance." *State v. LaGrand*, 153 Ariz. 21, 23-25, 35-36, 734 P.2d 563, 565-67, 577-78 (1987). Rose had said earlier that day that he would shoot anyone who tried to stop him from cashing the forged check. The murder occurred temporally and proximally close to the underlying crime, which was undoubtedly motivated by Rose's desire for pecuniary gain. The murder also facilitated Rose's escape and temporary evasion from arrest, and Rose made no attempt to conceal his identity, a fact that provides "powerful circumstantial evidence of an intent to facilitate escape or hinder detection and thus advance the underlying pecuniary gain objective." *Cañez*, 202 Ariz. at 159 ¶ 94, 42 P.3d at 590.

¶76 Finally, we reject Rose's argument that the (F)(5) aggravating factor is being bootstrapped to the felony murder

charge, which was based on the underlying crime of burglary. This Court "has repeatedly held that a conviction for felony murder predicated on robbery or armed robbery does not automatically prove the (F)(5) aggravator." *State v. Anderson*, 210 Ariz. 327, 351 ¶ 103, 111 P.3d 369, 393 (2005). "While armed robbery requires proof of a 'taking of property from the victim,' the pecuniary gain aggravator requires proof that the defendant's 'motivation [for the murder] was the expectation of pecuniary gain.'" *Id.* (alteration in original) (quoting *State v. Carriger*, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984)). Likewise, in this case the evidence required to establish the (F)(5) aggravator is different from that for burglary, which requires proof of entry with "intent to commit any theft or any felony." A.R.S. §§ 13-1506, -1508. The jury was properly instructed on the legal requirements for the (F)(5) aggravating factor and did not abuse it discretion in finding it proven.

C. **Mitigating circumstances**

¶77    In the penalty phase, the defendant is entitled to present any mitigating circumstances that the jury may consider in determining the appropriate sentence. A.R.S. § 13-751(C). Rose presented evidence of alleged mental health problems, multiple head injuries, drug and alcohol addiction, low IQ, use of methamphetamine in the days before the murder, and emotional neglect from his father, among other mitigating factors. On

appeal, Rose argues that "the mitigation in this case was overwhelming and a death sentence is not justified by the evidence."

¶78    We will overturn a jury's imposition of a death sentence only if "no reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Cota*, 229 Ariz. at 153 ¶ 95, 272 P.3d at 1044 (internal quotation marks omitted). The State presented evidence to rebut much of Rose's mitigation evidence. Based on the facts of the crime and the four aggravating factors, a reasonable jury could find that Rose's mitigation did not warrant leniency.

## IV.  CONCLUSION

¶79    We affirm Rose's convictions and sentences.[4]


_____
John Pelander, Justice


CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Scott Bales, Vice Chief Justice

_____

[4]    Rose also raised in an appendix to his opening brief twenty-six claims to avoid federal preclusion. We do not address those here.

41

_____
Robert M. Brutinel, Justice


_____
Ann A. Scott Timmer, Justice