NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

PRESTON ALTON STRONG, *Appellant.*

No. 1 CA-CR 12-0754
FILED 09-02-2014

---

Appeal from the Superior Court in Yuma County
No. S1400CR200800527
The Honorable John Neff Nelson, Judge

**AFFIRMED AS MODIFIED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist, III
*Counsel for Appellee*

Elizabeth M. Brown, Attorney at Law, Yuma
By Elizabeth M. Brown
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge Donn Kessler joined.

---

**H O W E,** Judge:

¶1        Preston Alton Strong appeals his convictions on two counts of first-degree murder, one count each of kidnapping, armed robbery, burglary, and attempted arson, and two counts of aggravated assault. For reasons that follow, we affirm all of the convictions, but modify the judgment of guilt and sentencing order to merge the two convictions for first-degree murder into a single count and vacate the sentence imposed on the second murder count.

## FACTS AND PROCEDURAL HISTORY

¶2        On the evening of November 2, 2007, the police were called to the victim's home to perform a welfare check. When officers entered the home, they smelled natural gas and saw multiple candles burning in the kitchen and dining room. The officers retreated from the home and contacted the fire department for assistance. After turning off the gas and ventilating the home, firefighters entered and extinguished the candles. The firefighters determined that all four burners on the home's gas stove had been turned on.

¶3        Once the home was safe to enter, officers found the victim dead in the master bathroom. The victim was dressed in pants and an undershirt, and his body was draped facedown over the bathtub with the lower part of the body outside the tub. The tub was partially filled with water, and the victim's head was in the water. In addition, the victim had both a leather belt and a cloth belt from a bathrobe wrapped around his neck.

¶4        An autopsy revealed that the victim died of asphyxia due to ligature strangulation with blunt force trauma to his head as a contributing factor. The victim's body was found to have bruising and numerous fractured ribs consistent with additional multiple blunt force impacts to his rib area and his legs before his death. Based on the condition of the body, the pathologist who performed the autopsy opined that the time of death was closer to when the victim was last seen alive in the late afternoon of November 1st, rather than when the victim was found dead the following evening.

¶5        The victim had engaged in strange conduct the day before he died. The victim called a friend that afternoon and offered her one hundred dollars if she would come by his home and take a check to the bank to cash for him. The check was in the amount of $24,000 and was left under the door mat at the victim's front door. While the friend went to and from the

bank, the victim called her several times to see if she had completed the errand. Once at the bank, the friend presented the check and the teller gave her the funds in packets of fifty-dollar bills bound with purple money bands. When the friend returned to the victim's home with the money, the victim opened the door only a crack and took the money, telling the friend that it was for a family emergency. The friend asked if she could come in, but the victim said no, claiming he was not dressed. The friend was puzzled by this response because she could see that the victim was in fact dressed, wearing the same pants and shirt he was found dead in the following evening. Shortly after the friend left, the victim called her again and asked if they could meet for dinner that evening. The friend agreed, but the victim never appeared at the time scheduled and never returned any of the friend's calls. The friend learned the next day that the victim's cell phone had been found near a canal and asked the police to conduct the welfare check.

¶6　　　　Strong's ex-girlfriend, the victim's co-worker, informed the police on the same evening the victim was found dead that she had concerns that Strong was involved in his murder. She told the police that Strong had a large amount of money that morning and no explanation for it. Subsequent investigation led the police to conclude that Strong forced the victim to arrange for delivery of the money from the bank, then killed him and left the gas turned on and the candles lit to cover up the murder by burning down the home.

¶7　　　　A grand jury indicted Strong on first-degree premeditated murder, first-degree felony murder, kidnapping, armed robbery, first-degree burglary, aggravated assault, and attempted arson. The State further alleged multiple aggravating circumstances and gave notice it intended to seek the death penalty.

¶8　　　　During pretrial proceedings, Strong offered to waive his right to a jury trial in exchange for withdrawal of the State's notice of intent to seek the death penalty. The State accepted the offer, and the trial court held a hearing at which Strong signed a written waiver of his right to a jury trial and the trial court questioned him about his decision. The trial court accepted the waiver, finding that it was made knowingly, intelligently, and voluntarily.

¶9　　　　Following a thirty-four-day bench trial, the trial court found Strong guilty on all eight counts. The trial court thereafter sentenced Strong to concurrent terms of natural life imprisonment on the first-degree murder convictions. The remaining convictions were ordered to be served consecutively to the murder convictions, with presumptive terms of five years' imprisonment on each of the kidnapping, armed robbery, and

3

burglary counts, and three and one-half years' imprisonment on each of the aggravated assault and attempted arson counts, totaling twenty-two years consecutive to the two concurrent life terms. Strong timely appealed.

## DISCUSSION

**¶10** Strong argues the trial court erred by: 1) denying his motion for change of venue; 2) denying his motion to disqualify the Yuma County Attorney's Office for prosecutorial misconduct; 3) finding that he made a voluntary waiver of his right to a jury trial; and 4) finding him guilty when insufficient evidence supported his convictions.

1. Motion for Change of Venue

**¶11** Before waiving his right to a jury trial, Strong moved for a change of venue, citing unfair pretrial publicity regarding the victim's murder and a second incident involving the murder of six people in which the police named him a "person of interest." He argued that given the nature and amount of the pretrial publicity and Yuma County's small population, receiving a fair trial in that county would be impossible. After hearing argument and considering the evidence, the trial court denied the motion.

**¶12** Strong claims the trial court abused its discretion in refusing to change venue. In response, the State argues Strong's election to proceed with a bench trial mooted any claim he may have had arising out of the denial of his motion for a change of venue. We agree that Strong's waiver of a jury trial mooted the issue of the motion for change of venue.

**¶13** A defendant is entitled to change the venue for his trial "if a fair and impartial trial cannot be had for any reason other than the interest or prejudice of the trial judge." Ariz. R. Crim. P. 10.3(a). Appellate review of a ruling on a motion for change of venue based on a claim of pretrial publicity involves two inquires: "(1) did the publicity pervade the court proceedings to the extent that prejudice can be presumed?; if not, then (2) did defendant show actual prejudice among members of the jury?" *State v. Murray*, 184 Ariz. 9, 26, 906 P.2d 542, 559 (1995). Strong explicitly states in his opening brief that he "is not alleging on appeal that presumed prejudice existed" and concedes that he must therefore "demonstrate actual prejudice" to prevail on his claim of error.

**¶14** In the absence of presumed prejudice, a defendant must demonstrate "that the pretrial publicity was actually prejudicial and likely deprived him of a fair trial." *State v. Davolt*, 207 Ariz. 191, 206 ¶ 49, 84 P.3d

4

456, 471 (2004). "The relevant inquiry for actual prejudice is the effect of the publicity on the objectivity of the jurors *actually seated.*" (internal quotation marks and citations omitted) (emphasis added). *State v. Cruz*, 218 Ariz. 149, 157 ¶ 21, 181 P.3d 196, 204 (2008). By having the case tried to the court rather than a jury, Strong eliminated any possibility of being deprived of a fair trial due to biased jurors.

2.      Motion to Disqualify Prosecutor's Office

¶15      A month before trial was to begin, Strong moved to disqualify the Yuma County Attorney's Office from handling the prosecution. He alleged that the prosecutor's office and the Yuma Police Department engaged in the following misconduct that interfered with his right to prepare a defense: 1) causing a police officer to cancel an interview defense counsel scheduled; 2) placing the statement "Please do not discuss your testimony with anyone" on subpoenas served on trial witnesses; 3) video recording a defense witness while he was inspecting evidence at the Yuma Police Department; 4) obstructing his ability to obtain records from the Yuma County jail; and 5) intimidating mitigation witnesses by advising them to "disassociate" with Strong. At the conclusion of a lengthy evidentiary hearing, the trial court denied the motion, finding that neither the Yuma County Attorney's Office nor the Yuma Police Department intentionally, or with reckless indifference, committed misconduct or prejudiced Strong's ability to prepare his defense.

¶16      Strong claims the trial court erred in denying his motion to disqualify, arguing that disqualification was an appropriate discovery sanction under Arizona Rule of Criminal Procedure 15.7 for the alleged prosecutorial misconduct. We review a ruling on a motion to disqualify counsel for abuse of discretion. *Villalpando v. Reagan*, 211 Ariz. 305, 307 ¶ 6, 121 P.3d. 172, 174 (App. 2005). We likewise review a trial court's ruling on a request for discovery sanctions for abuse of discretion. *See State v. Jackson*, 186 Ariz. 20, 24, 918 P.2d 1038, 1042 (1996) ("The imposition and choice of sanction are within the discretion of the trial court.").

¶17      Strong advances two arguments in his challenge to the trial court's denial of his motion to disqualify. First, he asserts that the trial court completely failed to include any law, analysis, or discussion in the order denying the motion. But the trial court's eight-page minute entry order denying the motion included an extensive discussion of the law pertaining to prosecutorial misconduct and the duty of a prosecutor to be a minister of justice. In addition, the order reflects that the trial court considered all the evidence presented with respect to the claims of prosecutorial misconduct and found that Strong failed to establish any conduct rising to the level that

would warrant disqualifying the Yuma County Attorney's Office from continuing with the prosecution. The trial court's order denying the motion was more than sufficient to address the merits of Strong's claim and explain the trial court's reasoning.

¶18 Second, Strong argues that the trial court erred by failing to consider the cumulative error doctrine in denying the motion. This argument is meritless. The trial court expressly referred to the cumulative error doctrine in its order and, after referencing the various alleged acts of misconduct, found that none of them prejudiced Strong's ability to prepare his defense. The trial court did not abuse its discretion in denying the motion to disqualify.

3.      Waiver of Right to Jury Trial

¶19 Strong argues that the trial court erred in finding that he voluntarily waived his right to a jury trial. We review a trial court's acceptance of a waiver of a jury trial for abuse of discretion. *See State v. Rose*, 231 Ariz. 500, 505 ¶ 12, 297 P.3d 906, 911 (2013) (holding appellate court "reviews a trial court's acceptance of a guilty plea for an abuse of discretion"). We must determine if "reasonable evidence" supports the trial court's finding that the waiver was voluntary and will consider the facts "in a light most favorable to sustaining the trial court's finding." *Id.* (citation omitted).

¶20 Even though the right to trial by jury is a fundamental constitutional right, a defendant may waive the right. *State v. Butrick*, 113 Ariz. 563, 565, 558 P.2d 908, 910 (1976). Under Arizona Rule of Criminal Procedure 18.1(b), the trial court may accept the waiver of the right after addressing the defendant personally to advise him of the right and ascertain that the waiver is made knowingly, intelligently, and voluntarily. Ariz. R. Crim. P. 18.1(b)(1).

¶21 The record reflects that the trial court fully complied with Rule 18.1(b). The written waiver Strong signed informed him of the right to trial by jury and the effect of his waiver. In addition, the trial court addressed Strong in open court about the waiver, confirmed that Strong had read and signed the waiver, and reviewed its contents with him to ensure that he understood the right that he was waiving. The trial court also inquired whether the waiver was the result of any threats or promises other than those included in the agreement between the parties, and Strong stated his decision to waive the right was voluntary and not the result of threats or any other unstated promises.

¶22      Strong claims that the record does not support the finding that his waiver was voluntary. Specifically, he argues that the trial court ignored his statements of apprehension about his ability to get a fair trial due to the Yuma County Attorney's Office and the Yuma Police Department's conduct in pursuing the prosecution and the pretrial publicity. The record shows, however, that the trial court was well aware of Strong's feelings on these matters, but correctly concluded that such circumstances did not render the waiver involuntary. A defendant's concerns that arise out the fact of prosecution and related matters such as adverse rulings are simply not the types of improper threats or fears that will render a waiver involuntary. *See United States v. Mezzanatto*, 513 U.S. 196, 209-10 (1995) (holding the "number of difficult choices that criminal defendants face every day" with respect to pending prosecutions do not make their waivers of fundamental rights inherently involuntary).

¶23      Here, after Strong made reference to feeling "pressure," the trial court gave him the opportunity to confer with counsel to ensure he understood the waiver, that he was waiving his right voluntarily for his benefit, and that the waiver was not the result of any improper promises or threats. When the trial court questioned Strong about any concerns he had after having the opportunity to discuss the matter with counsel, Strong stated without qualification that no threats or force were applied to have him waive his right to a jury trial. His counsel likewise confirmed that nothing in the circumstances of the case would render involuntary the exchange of the right to a jury trial for the withdrawal of the State's intent to seek the death penalty.

¶24      The requirements for a valid waiver of constitutional rights, including the right to a trial by jury, "are met when it appears from a consideration of the entire record that the accused was aware that he was waiving [his constitutional] rights and it appears that it was a knowing and voluntary waiver." *Rose*, 231 Ariz. at 508 ¶ 31, 297 P.3d at 914. On this record, the trial court did not abuse its discretion in finding that Strong knowingly, intelligently, and voluntarily waived his right to a jury trial.

4.      Sufficiency of Evidence

¶25      Strong contends that the State did not present sufficient evidence to support his convictions. He does not contest the evidentiary sufficiency of the evidence proving any specific element of the various offenses, but rather claims the evidence is insufficient to establish beyond a reasonable doubt that he was the person who committed the offenses. We review claims of insufficient evidence de novo, viewing the evidence in a

light most favorable to upholding the verdicts. *State v. Bible*, 175 Ariz. 549, 595, 858 P.2d 1152, 1198 (1993).

¶26 Arizona Rule of Criminal Procedure 20(a) requires the trial court to enter judgment of acquittal "if there is no substantial evidence to warrant a conviction." In considering claims of insufficient evidence, our review is limited to whether substantial evidence exists to support the verdicts. *State v. Scott*, 177 Ariz. 131, 138, 865 P.2d 792, 799 (1993). "Substantial evidence is proof that reasonable persons could accept as sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *State v. Spears*, 184 Ariz. 277, 290, 908 P.2d 1062, 1075 (1996). "If reasonable men may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *State v. Herrera*, 174 Ariz. 387, 393, 850 P.2d 100, 106 (1993) (citation omitted). "We do not consider . . . [whether] we would reach the same conclusion as the trier-of-fact, but only if there is a complete absence of probative facts to support its conclusion." *State v. Carlisle*, 198 Ariz. 203, 206 ¶ 11, 8 P.3d 391, 394 (App. 2000) (internal quotation marks and citation omitted).

¶27 The State presented substantial evidence from which the trial court could have concluded beyond a reasonable doubt that Strong was the person who committed the charged offenses. Evidence showed that Strong was familiar with the victim, who was a doctor, because his ex-girlfriend worked in the victim's medical office. Strong had an on-and-off relationship with his ex-girlfriend and hoped that she would move back in with him. During the time when the two were living apart, Strong was jealous and angry at the victim because he believed the victim was interested in dating his ex-girlfriend. Several months before the victim's murder, Strong became so angry at a party when someone commented on the victim's interest in his ex-girlfriend that Strong screamed at his ex-girlfriend and stormed out. As he was leaving, Strong went through the parking lot and damaged the victim's car by throwing rocks at it**.**

¶28 Evidence also showed that around the time of the robbery and murder, Strong needed money. Strong had an upcoming sentencing hearing for a criminal matter in which he owed a large amount of restitution. Strong believed that he might get probation if he could repay at least some portion of the restitution owed. He additionally owed thousands of dollars to his ex-girlfriend and other friends for loans they had made to him, and his ex-girlfriend urgently needed Strong to repay her before he was sentenced and possibly sent to prison. Because Strong knew the victim was a doctor, he had reason to believe that the victim had money available to him. Thus, Strong had motive for both the robbery and murder. *See State*

*v. Hunter*, 136 Ariz. 45, 50, 664 P.2d 195, 200 (1983) (stating "the fact that the defendant had some motive, good or bad, for committing the crime is one of the circumstances which, together with other circumstances, may lead the fact-finder to conclude that he did in fact commit the crime") (quoting W. LaFave & A. Scott, Handbook on Criminal Law § 29, at 208 (1972)).

¶29 Although no eye-witness testimony or physical evidence placed Strong inside the victim's home at the time of the robbery and murder, substantial circumstantial evidence indicated that he was the person responsible for the crimes. The lack of direct evidence does not preclude a finding of guilt, because criminal convictions may rest solely on circumstantial proof. *State v. Nash*, 143 Ariz. 392, 404, 694 P.2d 222, 234 (1985). The circumstantial evidence included a surveillance video from a local store showing that Strong purchased $4,300 in money orders with banded fifty-dollar bills within hours after the victim had the $24,000 delivered to him from his bank in that same form. Further, when his ex-girlfriend questioned him about the source of the $9,500 he gave her, when he had no money the previous day, Strong lied, telling her that he cashed the paycheck he had received the day before. She later discovered Strong's uncashed paycheck among his personal effects when they were turned over to her after he was taken into custody for his pending criminal case.

¶30 In addition to the evidence of Strong's possession of the proceeds of the robbery and murder, phone company records showed contacts that Strong's cell phone made with cell towers that placed him in the area of the victim's home during the time in which the victim arranged for his friend to cash the $24,000 and return the funds to him. Moreover, Strong had found a stray cat that morning, and a cat was found inside the victim's home during the welfare check even though the victim did not own a cat. The trial court could infer from this that Strong had brought the cat that he had found and left it at the victim's home.

¶31 Furthermore, Strong's efforts to cover his tracks and influence witnesses showed his consciousness of guilt. These efforts included avoiding showing identification while buying the money orders, instructing his ex-girlfriend to wash his clothes that he wore the night of the robbery and murder, and lying to her about cashing his paycheck and his whereabouts the evening of the robbery and murder. Strong further tried to convince one witness that he had been with the witness "way earlier" than 7 p.m. on November 1st as the witness had remembered. Strong sought to have another witness "remember" that he had shown the witness that same evening "hundreds" or "twenties," as opposed to fifty-dollar bills. Strong had flashed the witness a large stack of cash bound with a money band. Such evidence suggesting consciousness of guilt supports the

trial court's finding that Strong was responsible for the robbery and murder. *See Hunter*, 136 Ariz. at 48, 664 P.2d at 198 (observing evidence of "consciousness of guilt, in turn, gives rise to an inference of actual guilt").

¶32 Strong offered an alibi defense with witnesses testifying that he was with them on the afternoon the victim was murdered. This alibi testimony was contradicted, however, by other evidence such as phone company records indicating Strong was in the area of the victim's home at that time rather than with the alibi witnesses. Furthermore, a conflict in testimony between the State and defense witnesses does not render the evidence insubstantial. *State v. Toney*, 113 Ariz. 404, 408, 555 P.2d 650, 654 (1976). Rather, the finder-of-fact must weigh the evidence, resolve conflicts in the evidence, and assess the credibility of witnesses. *State v. Manzanedo*, 210 Ariz. 292, 293 ¶ 3, 110 P.3d 1026, 1027 (App. 2005). The alibi witnesses' credibility was a matter solely for the trial court to determine as finder-of-fact, with the trial court being free to disbelieve their testimony. *State v. Jeffers*, 135 Ariz. 404, 420, 661 P.2d 1105, 1121 (1983).

¶33 The circumstantial evidence, when considered as a whole, provided sufficient evidence from which the trial court could conclude beyond a reasonable doubt that Strong was the person who robbed and murdered the victim. The fact that the evidence left questions unresolved does not preclude the existence of substantial evidence. The State "is not required to disprove every conceivable hypothesis of innocence when guilt has been established by circumstantial evidence." *State v. Fischer*, 219 Ariz. 408, 419 ¶ 43, 199 P.3d 663, 674 (App. 2008) (internal quotation marks and citation omitted).

5.        Multiple Convictions for Murder

¶34 The trial court found Strong guilty on both counts one and two, which charged first-degree premeditated murder and felony murder respectively, and imposed two concurrent natural life sentences on the convictions. Although Strong did not challenge the multiple murder convictions and life sentences, the State notes in its answering brief that the murder convictions are multiplicitous.

¶35 Charges are multiplicitous if they charge a single offense in multiple counts. *Merlina v. Jejna*, 208 Ariz. 1, 4 ¶ 12, 90 P.3d 202, 205 (App. 2004). The two murder convictions stemming from a single death are multiplicitous because premeditated murder and felony murder are not separate crimes—"they are simply two forms of first-degree murder." *State v. Tucker*, 205 Ariz. 157, 167 ¶ 50, 68 P.3d 110, 120 (2003); *see also State v. Gerlaugh*, 134 Ariz. 164, 168, 654 P.2d 800, 804 (1982) ("[I]n Arizona, first-

10

degree murder is only one crime whether it is premeditated murder or a felony murder."); *State v. Williams*, 232 Ariz. 158, 160 ¶ 7, 302 P.3d 683, 685 (App. 2013) (recognizing that the majority of jurisdictions that have addressed the issue do not allow multiple murder convictions when only one person is killed).

¶36 When multiple convictions occur on multiplicitous charges, the appropriate remedy is to merge the two convictions and vacate one of the sentences. *Merlina*, 208 Ariz. at 4 ¶ 14 n.4, 90 P.3d at 205 n.4. Thus, we modify the judgment and sentencing order by merging the convictions on counts one and two into a single conviction for first-degree murder and vacate the second life sentence.

## CONCLUSION

¶37 For the foregoing reasons, we modify the convictions on counts one and two by merging them into a single conviction for first-degree murder and vacate the second of the two natural life sentences imposed by the trial court. We affirm Strong's convictions and sentences in all other respects.



Ruth A. Willingham · Clerk of the Court
FILED: gsh

11